THE STATE OF KANSAS, *Appellee,* v. FRED KEEHN, *Appellant.*

No. 17,444.

SYLLABUS BY THE COURT.

1. MISCONDUCT OF JURORS—*Not Prejudicial.* While the evidence was being presented at the trial of the defendant for murder one of the jurors drew an inaccurate sketch of the scene of the homicide in his notebook, so that he could follow the movements of the principals, and others, as detailed by the witnesses, more intelligently. When the jury entered upon its deliberations it felt the need of a sketch to visualize the scene, and no other being available, commenced to draw one, when the juror submitted his, which was used for the purpose. *Held,* a new trial will not be granted for misconduct of the juror or of the jury, or because the jury received "evidence, papers or documents not authorized by the court," as provided for in section 275 of the code of criminal procedure.

2. ——— *Same.* The jury agreed on a verdict of guilty but were unable for a time to agree on the degree of the crime, some favoring murder in the second degree and some favoring manslaughter. A letter to the judge was written asking all clemency for the defendant that could be given in second degree murder, and it was agreed that if a verdict of that kind were reached the letter would be signed and sent to the

judge. A ballot was then taken, resulting in a unanimous verdict of murder in the second degree, which was duly returned, and the letter was signed and delivered as proposed. *Held*, the verdict will not be set aside for misconduct of the jury, or because it was reached by artifice, or because it represents other than a fair expression of the opinion of the jurors.

3. ―――― *Impeaching the Verdict.* On the hearing of the motion for a new trial the defendant, to impeach the verdict, offered in evidence the affidavits of those jurors who, before the letter was written, voted for a verdict of manslaughter, which affidavits stated that the jurors making them were induced to vote for murder in the second degree because they believed the judge had power to lower the degree of guilt to manslaughter. *Held*, the court properly refused to consider the affidavits.

4. TRIAL―*Conduct of Trial Judge―Examining Witnesses.* The purpose of a trial in a criminal case is to ascertain the truth of the matters charged against the defendant, and it is a part of the business of the trial judge to see that this end is attained. He is a vital and integral factor in the discovery and elucidation of the facts, and whenever in his judgment the attorneys are not accomplishing the full development of the truth it is not only his right but it is his duty to examine and cross-examine the witnesses. The presumption is that this liberty will be honorably and impartially exercised in the interest of justice, and in this case it was not abused by the trial judge.

5. PRIVATE STENOGRAPHER―*Refused―Not Prejudicial.* The court refused an application made near the end of a long trial to permit the defendant to make use of a private stenographer to take down such portions of the evidence and proceedings as he might desire. No showing is made and no claim is made that the official record subsequent to the application is incorrect, incomplete or inadequate to the defendant's needs, or that he was embarrassed or hindered or caused any discomfort in completing his defense, or in presenting his motion for a new trial or in preparing his appeal. *Held*, that prejudice will not be presumed and that the error committed was without prejudice to the defendant's substantial rights.

6. SELF-DEFENSE―*Instructions.* The law of self-defense can not be presented, illustrated and applied all at once in a single statement to the jury. There must be arrangement and sequence in the presentation of declaration and limitation, proposition and qualification, statement and supplementary statement. It is not necessary that such a presentation con-

form to the rules of rhetoric or that any particular order be followed. It is sufficient if all the necessary statements clearly appear, and when they do so appear they will be read together for the true scope and sense of each.

7. ——— *Same.* In this case instructions upon the law of self-defense, modeled in part upon those given in the case of *The State v. Bohan,* 19 Kan. 28, are held to be defective in form, but not, therefore, so erroneous or misleading as to require a reversal of the judgment.

8. MALICE—*Instructions.* Instructions upon the subject of malice considered and held neither incorrect nor insufficient because the expression "malice express or implied" was used without discussing the distinction between express malice and implied malice, and without stating that actual malice is always intended.

9. VERDICT—*In Open Court—Recess.* It is not indispensable that the verdict in a murder case be returned in open court as provided in section 238 of the code of criminal procedure. It may be received during a recess of the court if the forms prescribed for preserving its authenticity are observed and the defendant is not deprived, against his will, of opportunity to protect his substantial rights.

10. ——— *Absence of Judge—By Consent.* A defendant on trial for murder may lawfully waive the presence of the trial judge at the return of the verdict, and he does so by an agreement made in open court, with the consent of the court, that the verdict may be received by a designated attorney in the absence of the judge, when the proceeding is in all other respects regular.

Appeal from Nemaha district court. Opinion filed November 11, 1911. Affirmed.

*Ira K. Wells, Abijah Wells, W. J. Gregg,* and *W. W. Redmond,* for the appellant.

*John S. Dawson,* attorney-general, *Chas. H. Herold,* county attorney, *A. E. Crane, E. D. Woodburn,* and *F. T. Woodburn,* for the appellee.

The opinion of the court was delivered by

BURCH, J.: On July 21, 1910, the defendant, Fred Keehn, shot and killed William Bleisner. At the following September term of court the defendant was

convicted of murder in the second degree and sentenced accordingly. He appeals.

The shooting took place following a school meeting at a district schoolhouse. The schoolhouse extends 24 feet east and west and 30 feet north and south and fronts north. Along its front extends a vestibule 13 feet long and 6 feet wide, with entrances at the east and west ends. The school grounds comprise an acre of land and the schoolhouse is located slightly west and north of the center of the tract. Along the west side of the lot is a wire fence. Thirty feet west of the northwest corner of the schoolhouse stands an old coal house 6 by 8 feet in size. Five feet south of it stands a new coal house 10 feet square. Between these coal houses and the fence is a driveway 7 feet wide. North of the lot is a public highway, and the entrance to the lot is through a gate at the northwest corner. Twenty-five feet south of the gate is an elm tree which stands in the fence. Those who attended the school meeting brought their vehicles into the lot. The defendant, his wife, his brother August Keehn, and two of his sisters came in a wagon. They drove into the lot, turned around, and hitched the team, which headed in a slightly northwesterly direction, to the tree. Joseph Hackenberger came in a buggy and hitched his horse to the fence some distance south of the new coal house. Others hitched their horses to a wire supported by posts along the road north of the schoolhouse. Other persons who attended the meeting were: John Frehl and wife, Thomas Kahl and wife, William Graffa and wife, Ferdinand Bleisner and his son, William Bleisner, who was killed. Chester Bleisner, a brother of the deceased, was working in a near-by field and came into the school grounds a short time before the killing.

Shortly before the business of the meeting was concluded Graffa, a partisan of the Keehns, brought on the trouble by a remark calculated to excite Ferdinand Bleisner, who had grievances against the Keehns. The

result was that, after passing out of the building through the east door of the vestibule, Ferdinand Bleisner wanted to fight the Keehns. An encounter at that place was prevented, although Kahl, a partisan of the Bleisners, seemed to desire that one should occur. The Keehn brothers had come to the meeting armed, Fred with a pistol and August with a chain billy, but they seemed willing to escape difficulty, moved toward their wagon, and August and some of the Keehn women climbed in. Ferdinand Bleisner, however, was bent on trouble. Against the protests and entreaties of some of those present, he followed the Keehns, and from the ground on the north side of the wagon made a demonstration against August, whom he very much desired to chastise. August produced his billy, and Ferdinand then commenced to unhitch the tugs of the horse on the north side of the wagon tongue in order to arm himself with a singletree. At the sight of August's weapon, Kahl, who had followed closely after Ferdinand, went in search of a club. While Ferdinand was endeavoring to secure the singletree the defendant, who was then on the south side of the wagon, thrust a seat board across the front of the wagon, striking Ferdinand, and then threw the board at Ferdinand, striking him on the side of the face, destroying one eye, fracturing the cheek bone, knocking him down and rendering him insensible for a long time. Chester Bleisner having appeared, he and August Keehn, who had then reached the ground, engaged in a fight on the north side of the wagon, which was participated in by one of August's sisters, who was armed with a portion of a broken stool. While this *melee* was in progress the defendant shot William Bleisner at a point in the vicinity of the southeast corner of the new coal house.

The witnesses do not agree on the precise place where the shooting took place, the relative positions of the de-

49—85 KAN.

fendant and Bleisner at the time or their previous movements.

The testimony of John Frehl, a witness for the state, appears to be unbiased. He was standing north and west of the northwest corner of the schoolhouse, watching the fight on the ground by the Keehn wagon, when the shot was fired. He turned round immediately and saw the defendant standing near the southeast corner of the new coal house with his pistol rather pointed toward William Bleisner, who was north and east of and about 10 feet from the defendant, and who was then coming north holding his hands on his breast, where he was shot.

Mrs. Kahl, a witness for the state, says she met William Bleisner near the end of the Keehn wagon, apparently going around to where his father lay. She put her hand on his arm and told him not to go there. The shot was then fired and he placed his hand on his breast and said, "My God, Lil, I am shot." She glanced around and saw the defendant standing some four or six feet away.

Graffa's team was tied north of the schoolhouse and east of its east side. He was a witness for the defendant and claimed that from a point near the rear of his wagon he observed what took place. He said he saw Will Bleisner come from between the coal houses with a board 6 inches wide and 6 or 7 feet long, go north and strike the defendant just after the defendant had felled Ferdinand Bleisner. The defendant then backed west to the fence and turned south along the driveway between the coal houses and the fence, meanwhile dodging blows of the board in William Bleisner's hands. In their progress south they passed behind the coal houses, but the line of Graffa's vision was such that a six-inch space was open between the two coal houses and through this he saw them, the defendant being ahead. Presently the defendant came into view around

the southeast corner of the new coal house, and then headed back. The next thing he saw was William Bleisner with the board, and then the defendant pulled his gun and shot, his victim being at the time northeast of him.

Hackenberger, who was a witness for the defendant, said that from a position north of his horse and near its shoulder he saw William Bleisner strike the defendant with the board near the Keehn team, and saw the two come down between the coal houses and the fence, backing off and changing around, and then turn east. Their movements were continuous but he could not tell which one was in the lead. When they were south and east of the new coal house he saw the defendant turn around, and then the shot was fired. The defendant was then almost due west of Bleisner, the two were not more than an arm's length apart, and Bleisner had the board raised to strike. He could not explain how Bleisner got east of the defendant.

Mrs. John Frehl testified that she saw the defendant throw the board which felled Ferdinand Bleisner, and saw August Keehn come out of the wagon. Then she started west down the road. After she had gone some distance she heard a noise like the clap of a board hitting a horse. She looked around and saw the defendant and William Bleisner on the south side of the new coal house. Bleisner had his right hand on the defendant's left shoulder. She saw no board. She looked toward the wagon but from her position could see nothing of what was taking place there. She saw her husband, however, standing in the school yard. She then went on, and in a short space of time heard the shot fired.

The defendant's account was quite schematic. Just after he felled Ferdinand Bleisner he was struck on the head, and turning round to the left he saw William Bleisner with the board. He backed to the fence and started to run south, receiving blows on the head and

arm. West of the coal houses he was struck on the head and knocked to his knees. Bleisner then kicked him in his right side. After being kicked while down the defendant drew his pistol, held it up, and said, "Quit or I will shoot." Bleisner replied, "I'll finish you, you ————." The defendant then rose as quickly as possible and started south again, but finding his progress obstructed by Hackenberger's horse and buggy he turned east along the south side of the new coal house, and when three or four feet from its east end Bleisner jumped around to the east of him and headed him off. He was then fairly pocketed, with no avenue of escape. He was weak and dizzy, and as Bleisner raised the board to strike again the defendant shot him. From the time he was knocked down, the defendant, in trying to get away from his assailant, was going forward, and he went as fast as his crippled and dazed condition would permit, until he was headed off.

Hackenberger had a clear view of the two men from the time they left the wagon until the shot was fired. He was not conscious of losing sight of them any of the time. They passed near him and the shot was fired within 6 or 8 feet of the rear of his buggy. He was in a position to see and hear everything that occurred, but he has nothing whatever to say of the defendant being knocked down, or kicked, or of the defendant's warning that he would shoot, or of Bleisner's threat to finish the defendant, or of a sound like a board striking a horse. On the way home after the shooting the defendant said to one of his sisters that he did not aim to shoot Bleisner so high up but aimed to shoot him in the legs. He made no complaint of having received any injury himself and gave no indication of being injured. Two days afterward his attorney sent a physician to the jail, who made an examination and took measurements, professedly for the purpose of evidence. The most prominent mark the defendant bore attributable

The State v. Keehn.

to blows of the board was a large bruise on his right
arm. He shoots with his left hand. There were some
round bruises on his head and a wound not made with a
blunt instrument. The doctor did not visit him again
for eight days.

Of all the persons present only Graffa and Hacken-
berger, aside from the defendant, testified that the
deceased had a board. Shortly after the shooting
Graffa made the statement that he did not see all of it,
and that he had about all he could do to take care of his
wife, who was not strong, who was excited, and who
was begging him to go home. He also made the state-
ment that he believed Will Bleisner died and went to
his grave an innocent man. Besides these matters there
was much in the case to weaken the force of his de-
scription of the defendant as a belabored man trying
to escape. Hackenberger's statements regarding Bleis-
ner's use of the board were so contradictory that the
jury might well have disregarded his testimony on that
subject. The defendant, while slightly shorter, was
some 30 pounds heavier than Bleisner.

It is said that a new trial should be granted because
the jury were guilty of misconduct and received and
considered evidence in the form of a paper or document
not authorized by the court. The defendant had caused
a map or plat of the schoolhouse grounds to be pre-
pared showing the buildings and other permanent ob-
jects of the locality and some other matters. This map
had been used in the examination of the principal wit-
nesses, and several of them had undertaken to mark
upon it the location of various persons and occurrences
material to the controversy. Near the end of the trial
it was discovered that this map was incorrect. Soon
after the jury retired they made a request for the map,
and were informed that the court would not permit
them to take it. In an affidavit read on behalf of the

defendant one of the jurors states what then occurred, as follows:

"Then one of the jurors, in the presence and hearing of all of them, said, 'we don't need that map; I have a map similar to it or as near right as the one offered in evidence,' and he produced from his pocket a map or plat in a notebook which the jury afterward considered, which plat or map was not the one offered in evidence, but the plat or map produced by said juror."

The sketch is highly unsatisfactory to the defendant because the corner of the schoolhouse cut off Graffa's view of the defendant and Bleisner when the shot was fired, and because the location of Hackenberger's horse and buggy afforded the defendant a much clearer field than he claimed to have at the time of the shooting. The argument is that "the map evidently was made only to contradict the defendant and his witnesses"; that the juror became a witness instead of a juror, "a witness who verifies the map and asserts its accuracy"; and that the jury considered the map and were undoubtedly influenced by the assertion of the juror that it was correct. One defect of this argument is that it is not supported by the facts stated in the affidavit. According to the affidavit the full extent of the claim of the maker for his sketch was that it was similar to the one offered in evidence and as nearly correct as the one offered in evidence, which was admittedly not correct. Besides this a number of jurors were called as witnesses and it was abundantly proved that no claim was made that the map was accurate, that it was not so represented and was not so regarded. The sketch was made by juror Cagwin, who testified that he had never seen the schoolhouse or grounds, had no information except what he learned from the witness, and that the sketch was made and produced under the following circumstances:

"I sat up there and I could n't follow around on the school ground, and I took this notebook out of my pocket and drew a sketch of the grounds and where

the teams was hitched for my own benefit, and after
I drew that I followed around there all right; and that
was an hour or two before the one put here on the
table. . . . When we asked for this chart that .
was showed here and we couldn't get that, some one
started to draw on a piece of paper, and I said there
is no use doing that, I have got one here that will do
just as well, and I pulled this out."

Section 275 of the code of criminal procedure reads
as follows:

"The court may grant a new trial for the following
causes, or any of them:

"First, when the jury has received any evidence,
papers or documents not authorized by the court, or the
court has admitted illegal testimony, or for newly dis-
covered evidence."

This statute must be given a reasonable interpre-
tation. (*The State v. Taylor,* 20 Kan. 643.) It is not
mandatory and it clearly does not belong to the class
in which a new trial must be peremptorily granted
without any inquiry into consequences upon substantial
rights. When it is not apparent that the contents of
an extraneous paper could have influenced the verdict
a new trial should not be granted unless actual preju-
dice be shown (*The State v. Taylor,* 20 Kan. 643),
and when the natural effect of the unauthorized matter
appears to be prejudicial the state may still show that
no injury in fact resulted (see *The State v. Lantz,*
23 Kan. 728; *The State v. Burton,* 65 Kan. 704, 70 Pac.
640). The sketch complained of was not a foreign
evidentiary document like the atlas which the bailiff
gave the jury in the case of *The State v. Lantz,* 23 Kan.
728. It represented nothing more than Cagwin's idea
of what the testimony disclosed. This idea he could
present to the jury without misconduct, and the fact
that the sketch was not accurate does not indicate mis-
conduct. The purpose of the sketch, however, was to
enable Cagwin to follow the testimony intelligently.
This court was obliged to do just as Cagwin did, as it

proceeded with a reading of the record.  As soon as
the jury entered upon its consideration of the case it
immediately recognized the necessity for some kind
of a drawing to visualize in a general way the scene
of the tragedy.   Deprived of the chart used on the
trial, the jury set about to make one if its own, and
Cagwin merely offered his as one that would serve
their purpose.   Under these circumstances no infer-
ence of prejudice could reasonably be drawn from the
making and exhibition of the sketch, all possibility of
prejudice from its use by the jury was disproved and
no misconduct of any kind appears.

It is claimed that the court admitted improper tes-
timony.  The two wounded men were taken to the home·
of Ferdinand Bleisner, two and one-half miles from the
schoolhouse.   Physicians were called, but by the time
they arrived William Bleisner was dying and they gave
their first attention to Ferdinand.   After proving the
cause of William's death by these physicians the state
interrogated them respecting the nature and extent
of Ferdinand's injuries.   The testimony was admitted ·
on the theory that Ferdinand's wounds, whatever they
were, were a part of the transaction at the school-
house and that the entire transaction there was rele-
vant to the question of the defendant's frame of mind
when he took William's life.   The entire transaction
at the schoolhouse was indeed relevant to illustrate the
defendant's mind and purpose, but only according to ·
the aspect which the transaction presented at the time,
and the testimony complained of should have been ex-
cluded.   In the instructions to the jury, however, the
court limited the evidence involving Ferdinand Bleis- ·
ner so narrowly that the admission of that portion of
it which has been referred to could not have been prej-
udicial.

· The twenty-fourth instruction reads as follows:

"The evidence as to the assault upon Ferdinand
Bleisner is not offered in this case as evidence of an
offense for which the defendant is now on trial, and

you are to consider the evidence offered in that connection only as showing the acts of this defendant, but in no event should the defendant be held accountable or responsible in this case for the injuries inflicted upon the said Ferdinand Bleisner."

It is said that the prolongation by the doctors of the harrowing tale may have had a tendency to inflame the passions of the jury. This is surmise only, and it may just as easily be surmised that the jury, as normal men, were tranquilized by this demonstration of "even-handed justice" (Macbeth, I, 7) whereby the bloody instruction which vicious Ferdinand would have taught with the singletree returned unexpectedly upon his own head.

Chester Bleisner was permitted to testify that the deceased left a wife and five children, and a new trial is asked for that reason. To show that he was not expecting William Bleisner to be at the school meeting the defendant testified that as he was going south to the schoolhouse he met William Bleisner with his wife and family going north. To show that he had no feeling against the deceased the defendant testified that their children attended the same school; that when taking his own children to school he would ask the children of the deceased to ride, which they did, and that the last time they rode with him was on the day before they were taken with scarlet fever. It seems, therefore, to have been material to the defense that the deceased left a wife and children. The number of his children, the only additional fact supplied by Chester's testimony, seems quite inconsequential.

It is claimed that the jury were guilty of misconduct tending to prevent a fair consideration of the case and that the verdict was reached by means other than a fair expression of opinion on the part of all the jurors. Evidence adduced relating to this assignment of error shows that after the jury had been out about two hours an agreement upon a verdict of guilty was reached. After that divergent views respecting the degree of

guilt and differences of opinion regarding the instructions were expressed. The jury desired to communicate with the judge, but were informed by the bailiff that they could not do so, that the judge had gone home, that they could not receive further instructions, and that they could not have the statutes. After that the jury discussed the case, and arguments and illustrations from individual standpoints were advanced. Later it became known that all the jurymen favored a verdict of murder in the second degree except two, who favored a verdict for manslaughter. A letter was then written, addressed to the judge, asking all the clemency for the defendant that could be given on a verdict for murder in the second degree. The subject of writing the letter to the judge occupied considerable time, and it was finally understood that if a verdict of murder in the second degree were reached the letter would be signed and sent to the judge. Afterward a ballot was taken, resulting in a unanimous verdict of murder in the second degree. The letter was then signed by all the jurors and was given to one of them for delivery to the judge, who subsequently received it.

We have here a state of facts almost identical with that appearing in the case of *The State v. Rhea,* 25 Kan. 576, concerning which the court said:

"On a motion for a new trial the affidavits of certain of the jurors were offered, tending to show that upon consultation in their room it appeared that the larger part of the jury favored the verdict finally returned, while a smaller number was opposed to it, and that a compromise was agreed upon by which the verdict and a unanimous recommendation to mercy were returned. Conceding that this is a matter in respect to which the affidavits of jurors are admissible in impeachment of their verdict—yet this is doubtful, (*Perry v. Bailey,* 12 Kan. 539)—and still we think the verdict must be sustained. It does not show a verdict reached by lot or chance, or one to which the assent of the entire jury was not given. The condition was in fact com-

The State v. Keehn.

plied with. The recommendation to mercy was signed by all, and all assented to the verdict upon that basis. It does not appear that any were in favor of acquitting the defendant of all guilt, but simply that all did not favor the verdict prepared by the majority. The most that can be said is, that there was a difference as to the degree of guilt; and yet they all assented to it. And where there was no chance, or lot, or artifice, or bribery, or threat, a juror may not be heard to say why he assented. It often happens that a jury, on retiring to consider of its verdict, finds its members disagreeing as to the degree of a defendant's guilt, and finally reaches a verdict by yielding on one side or the other. In one sense the verdict is a compromise, but where no undue influence is shown, and no reaching of the result by lot or chance or stratagem, the verdict must stand." (p. 581.)

In addition to this, the court investigated the nature of the question which the jury debated and which formed the obstacle to an agreement. There is some evidence that it was the degree of guilt and whether the judge had power to lower the degree of the crime specified in the verdict. The great weight of the evidence, however, is that it was the amount of punishment the defendant would receive and whether the judge had a discretion over the term of imprisonment for second-degree murder. The court found according to the weight of the evidence, and, consequently, strategem to secure, by means of the letter, the adherence of the jurors who had stood for manslaughter must be taken as disproved.

The defendant produced the affidavits of the two jurors who were the last to agree to the verdict, stating that they were induced to do so by the letter to the judge, who they understood and believed had power to lower the degree of the crime to manslaughter. The court properly declined to consider these affidavits. They contradicted that which in the solemn discharge of a sworn duty the men making them had asserted. (*The State v. Horne,* 9 Kan. 119, 132.) The true rule

and the reason for it were long ago announced by this court in the following language:

"In *Wright v. I. & M. Telegraph Co.*, 20 Iowa, 195, Cole, J., after a full consideration of the authorities, thus states the conclusion to which the court arrives: 'That affidavits of jurors may be received for the purpose of avoiding a verdict, to show any matter occurring during the trial, or in the jury room, which does not essentially inhere in the verdict itself, as that a juror was improperly approached by a party, his agent or attorney; that witnesses or others conversed as to the facts or merits of the cause, out of court, and in the presence of jurors; that the verdict was determined by aggregation and average, or by lot, or game of chance, or other artifice or improper manner; but that such affidavit to avoid the verdict may not be received to show any matter which does essentially inhere in the verdict itself, as that the juror did not assent to the verdict; that he misunderstood the instructions of the court, the statements of the witnesses, or the pleadings in the case; that he was unduly influenced by the statements (or otherwise) of his fellow jurors, or mistaken in his calculations of judgment, or other matter resting alone in the juror's breast.' . . . This quotation from the opinion of Mr. Justice Cole seems to us to state very clearly and correctly the law applicable to questions of this kind. As to all those matters lying outside the personal consciousness of the individual juror, those things which are matters of sight and hearing, and therefore accessible to the testimony of others, and subject to contradiction—'overt acts,' as the Massachusetts court expresses it—it seems to us that the interests of justice will be promoted, and no sound public policy disturbed, if the secrecy of the jury box is not permitted to be the safe cover for the perpetration of wrongs upon parties litigant. . . . Public policy forbids that a matter resting in the personal consciousness of one juror should be received to overthrow the verdict, because, being personal, it is not accessible to other testimony; it gives to the secret thought of one the power to disturb the expressed conclusions of twelve; its tendency is to induce bad faith on the part of a minority, to induce an apparent acquiescence with the purpose of subsequent dissent, to induce tampering with

individual jurors subsequent to the verdict." (*Perry v. Bailey,* 12 Kan. 539, 544, 545.)

It is said that a fair trial was prevented because of the misconduct of the court in participating in the examination and cross-examination of witnesses.

It is not possible within the limits of even an extended opinion to discuss all the supposed grievances of the defendant comprehended by this assignment of error. The criticism of the court's conduct with reference to the witness Kahl is fairly illustrative.

Kahl was the first witness who gave any information respecting Hackenberger's horse. He was interrogated as follows:

"By Mr. Herold (county attorney):

"Ques. Did you see anybody or anything while you were there at the northeast corner of the schoolhouse looking for a club? Ans. I did n't see anybody; no, sir.

"Q. Did you see anything? A. I saw a horse, the head of a horse.

"Q. Which way was the horse headed? A. East.

"Q. Coming around the south end of the schoolhouse? A. Seemed to be standing still.

"Q. Do you know whose horse it was? A. Mr. Hackenberger's.

"Q. Was that before or after you heard the shot? A. Just about the same time.

"By the court:

"Q. Could you tell whether the horse had any harness on, or have any gear on him, or saddle, or how he was? A. I did n't particularly look; I just noticed the horse.

"Q. Did you see any person with the horse? A. No, sir.

"Q. Don't you know whether the horse was tied or not? A. I don't think he was."

It will be noted that the witness identified the head of a horse, pointing east and not in motion, as Hackenberger's. He was not pressed for details and the county attorney apparently was passing on to the matter of the relation in time of the observation and the

firing of the shot. Manifestly it was proper for the court to intervene and secure all the information the witness possessed before he was led to other subjects.

After the cross-examination closed the county attorney asked the witness a single question which, with the answer, follows:

"Ques. You say when you went around to the east side of the schoolhouse to look for a club you saw Hackenberger's horse's head and shoulder down at the southeast corner of the schoolhouse; how did you distinguish that was his horse? Ans. Because it was a spotted horse."

The following proceedings then took place:

"By the court:
"Ques. You knew the horse? Ans. Yes, sir.
"Q. Had particular markings? A. Yes, sir."

Cross-examination by Mr. Gregg:

"Ques. Why did n't you tell about seeing the horse around the schoolhouse when you testified before the justice of the peace? Ans. I did n't think about it.

"Q. This is the first time you told on the witness stand about seeing a horse around the schoolhouse, is n't it? A. I think so."

Here again the unmistakable purpose of the court was the laudable one of ascertaining what this witness knew. Yet the remarkable argument is made that the court suggested to the witness that he knew the horse because it had peculiar markings, and that the suggestion was made for the purpose of impressing more firmly on the minds of the jury the fact that Kahl could not be mistaken, with the effect of inducing the jury to believe that the court believed Kahl, and with the further effect of inducing them to disbelieve Hackenberger when he should afterwards come on the stand and swear, as he did, that when the shot was fired he and the horse were still at the post where the horse had been tied. When Hackenberger was placed on the witness stand he told of getting into his buggy and driving

away after Bleisner was killed, and was cross-exam-- ined as follows:

"By Mr. Crane (for the state) :

"Ques. As a matter of fact, at the time the shot was. fired, were n't you driving in your buggy just around the southeast corner of the schoolhouse? Ans. No, sir.

"Q. What color horse did you have? A. My horse is a spotted horse."

"By the court:

"Ques. Was your horse at any time during that day at or near the southeast corner of this schoolhouse, except when you drove away from there? Ans. No, sir.

"Q. That is the only time it was there? A. Yes, sir."

Adopting the method of reasoning employed above, the court here suggested to Hackenberger that his horse was at the southeast corner of the schoolhouse once and only once, that is, when it was driven away after the shot was fired, and made the suggestion for the purpose of firmly impressing the fact on the mind of the jury that Hackenberger could not be mistaken, with the effect of inducing the jury to believe that the court believed Hackenberger, and with the further effect of inducing them to disbelieve Kahl.

Far-fetched deductions similar to these are made re-specting the purpose and effect of the court's questioning of witnesses Graffa, Matthews, Mrs. Kahl and others. Stress is also placed upon certain remarks of the court connected with the examination of Mrs. Kahl. Perhaps such remarks are open to criticism from the standpoint of good taste, but not otherwise.

Hackenberger filed an affidavit in support of the mo-tion for a new trial in which he attempted to describe the conduct of the court in reference to his examination as a witness and its effect on him. He said that the court interposed and asked questions and assisted in con-ducting his cross-examination until, in his confusion, he failed to apprehend the nature of the questions pro-pounded by the court and the counsel for the state; that one question would be asked by counsel for the state,.

and before having time to answer, a question would be propounded by the court; and that by reason of such examination of the court and counsel he was so confused, frightened, embarrassed and intimidated that he failed to state all of the facts that were within his knowledge as he understood them; that his mind became a blank, and he became so bewildered he must have given the jury the impression that his testimony was not worthy of belief.

There is no instance in the record in which Hackenberger was interrupted by a question from the court before he could answer a question by counsel. Just once he was interrupted by the court, but that was when he was not answering the question propounded to him. What the court then said vindicates itself:

"By the court:
"Ques. You are not answering the question; they are asking you to carry your mind back to the preliminary trial, and asking you if those questions were asked you and answers returned by you at the preliminary trial; were they or not? Ans. Some of them were."

As a matter of fact, the witness was in deep water before the court intervened at all in his cross-examination. He had contradicted previous statements he had made in the course of the same examination and had contradicted the testimony he gave at the preliminary examination. After that the court did make what appears from the record to be a patient and sincere effort to find out what contribution the witness could make to the truth of the matter under investigation. Many of the questions were obviously framed to give the witness poise before answering, and if he were scared, embarrassed and bewildered, and if the jury were not impressed by his testimony, the fault lay with him and not with the court. There is no justification for inserting the word "intimidated" in Hackenberger's affidavit.

A very common notion of the function of a trial judge in respect to the examination of witnesses in a criminal

The State v. Keehn.

case is expressed in the opinion in the case of *Dunn v. The People,* 172 Ill. 582, 50 N. E. 137:

"It is within the power of the court to propound pertinent and properly framed questions to a witness. The exercise of the power, if the questions propounded by the court are directed to crucial points of the case, is most likely to arouse the serious apprehension of the one or the other of the parties, and certainly places counsel in a situation of great embarrassment if they conceive a question asked by the court as leading and suggestive in form or improper for any cause. It is a task of great delicacy and much difficulty for a presiding judge to so conduct the examination of a witness that nothing, in either the tone or inflection of the voice, the play of the features, the manner of propounding or framing the question, or the course of investigation pursued in the examination, will indicate to the jury the trend of the mind of the questioner. An extended examination of a witness by the court must be unfair unless it partakes partly of the nature of a cross-examination, and though great skill and tact and perfect fairness be employed, there is much danger the impression or opinion of the court as to the truthfulness, candor and reliability of the witness and as to the weight and value of his testimony will be manifested to the jury. Though at times the court may, by an opportune and carefully considered question, elucidate a point, aid an embarrassed witness or facilitate the progress of a trial without in any degree influencing the jury or arousing distrust in the minds of the parties or their attorneys, yet the examination of witnesses is the more appropriate function of counsel, and it is believed the instances are rare and the conditions exceptional in a high degree which will justify the presiding judge in entering upon and conducting an extended examination of a witness, and that the exercise of a sound discretion will seldom deem such action necessary or advisable." (p. 595.)

From this it would appear that while the judge has ample authority, it is seldom safe for him to undertake to exercise it. This court entertains a different view. The purpose of a criminal trial is to ascertain the truth about the matters charged in the indictment or infor-

mation, and it is a part of the business of the judge to see that this end is attained. He is not a dumb and mask-faced moderator over a contest between sensitive and apprehensive, or perhaps wily and ingenious, counsel. He is a vital and integral factor in the discovery and elucidation of the facts. He must have a full and accurate comprehension of each and all of the facts in order to instruct the jury, to present the facts to the jury if he should choose to do so (Crim. Code, § 236), and to determine, finally, upon a motion for a new trial, whether justice has been done. Therefore, on his own account he is not obliged to rest content with the modicum of evidence which counsel may dole out or to accept as final their showing of knowledge, means of knowledge and credibility on the part of witnesses. But beyond this, it is the function of the judge to aid the jury in obtaining a comprehension of the facts equal to his own, in order that a just verdict may be reached. Therefore, whenever in his judgment the proceeding is not being conducted in a way to accomplish the purpose for which alone it is instituted, the full development of the truth, or whenever he can effect a better accomplishment of that purpose, he not only has the right but it is his duty to take part.

Limitations upon this power appear from the statement of the purpose to be subserved, and are merely those which good sense and propriety suggest. The judge should not place himself in the attitude of helping or hurting either side, but whenever it appears to him proper he should fearlessly endeavor to develop the truth with all possible clearness and certainty, whichever side the truth may help or hurt. The judge will always have a personality of his own which he can not disguise or conceal. But the only tact he need display is sincerity, and so long as he is sincere he need feel no timidity in the discharge of his public duty because of

the possible tone or inflection of his voice or the play of his features.

"The presumption that this liberty will not be honorably and impartially exercised is not to be tolerated for a moment. Counsel, in their zeal to acquit their clients, seems to take it for granted that the only object of courts is to convict. Until called upon to discharge the solemn and responsible functions of a judge, they never can fully appreciate the high sense of obligation under which they act, to God and their fellow citizens. . . . Counsel seek only for their client's success; but the judge must watch that justice triumphs." (*Epps v. The State,* 19 Ga. 102, 118, 119.)

It is natural that able and masterful attorneys should be intolerant and resentful of any participation by the judge in the examination and cross-examination of witnesses. Should the judge exercise his right, professional bias and zeal will always be able to make a strong showing of prejudice on appeal. The result is that too often in this country the lawyers have had their own way, and judges have been reduced to the level of impotent spectators of trials before them, much to the detriment of our criminal jurisprudence. There is nothing in the constitution or statutes of this state which fetters the efficiency of trial judges as a part of the legal machinery for developing and establishing the facts in criminal cases, and in this case the trial judge did not abuse his power.

It is said that the court was guilty of misconduct because it refused to permit the defendant to make use of a private stenographer. After the trial had been in progress for three days, and was drawing to a close, the defendant asked permission to call to his assistance a private stenographer to report such portions of the evidence and proceedings as he might desire. The application was refused, and when it was renewed at the hearing upon the motion for a new trial it was again refused. The circumstances which prompted the request and the reasons of the court for refusing it are

not now material. The application was presented in a respectful manner, no discourtesy to the court was intended, and the stenographer proposed was an unobjectionable person. Therefore the court erred. (*The State v. Dreany*, 65 Kan. 292, 69 Pac. 182.)

The record and the brief are both silent as to the effect of the court's ruling upon the defendant's case. There is nothing to indicate that after the request was made the official record was incomplete, incorrect, or inadequate to the defendant's needs, or that he was embarrassed or hindered or caused any discomfort in completing his defense or in presenting his motion for a new trial or in preparing for his appeal. For anything that appears, the private stenographer would have been a mere supernumerary, and the defendant is in the attitude of demanding a new trial, not because he was harmed, or because a wrong result was reached, but merely because the trial court misapprehended the law. The defendant asserts that he had a "constitutional" right to the stenographer, and the implication is that prejudice must be presumed. But no provision of the constitution was violated. The constitution guarantees that a defendant shall have counsel, but not clerks, stenographers and other assistants to counsel. It further guarantees a public trial. But the trial was public. The stenographer was not excluded from the court room. He was merely forbidden to report the proceedings. No other provision of the constitution applies, and the right claimed must be deduced from the general policy of the law to afford a person charged with crime every reasonable facility for the preparation and presentation of his case. It is therefore not absolute, but it is relative to the situation, circumstances and needs of the defendant; and a naked denial, without any appreciable effect on a proceeding otherwise regular, will not be sufficient to nullify the result of such proceeding.

It is claimed that the court erred in its presentation

of the law of self-defense, the particular instruction complained of being the twenty-third, which reads as follows:

"A person assaulted may repel force with force in defense of his person; a person is not compelled to retreat or flee from his adversary; and one who is unlawfully attacked by another, or is approached or is pursued by another under the reasonable belief that he is about to be attacked, may stand his ground and use such force as at the time reasonably appears to him to be necessary. He is justified in acting upon the facts as they appear to him, and is not to be judged by the facts as they actually are. The law allows an individual in the defense of his person *to use such means as are necessary.* In the selection and use of these means he must of necessity exercise his own judgment; but he acts at his peril, and *if he goes beyond what is necessary to accomplish the object,* and violates the law, he must abide the consequences. In the exercise of his judgment he must act rationally. While a person assaulted may repel force by force, yet it does not follow that he may, without any apparent necessity, use a deadly weapon or deal a deadly blow for that purpose. If two men of equal strength meet, and one strike the other with the fist, the law would not usually justify the assaulted party in shooting or stabbing his assailant to death. A man may protect himself, but the law does not justify him in slaying his assailant without a necessity therefor, either real or apparent."

For convenience, the objectionable expressions in this instruction have been italicized. The argument is that they should have been qualified by some such phrase as "under the circumstances as they appear to him."

Besides the twenty-third, the court gave other instructions bearing upon the subject of self-defense, which read as follows:

"*Twenty-second.* . . . Actual and positive danger, however, of life or of great bodily harm is not always necessary to justify an act of self-defense; thus, if 'A' should aim an empty pistol at 'B' and at the same time threaten to kill him, but 'B,' supposing that the pistol was loaded and that he was in immediate danger of the

loss of his life, should shoot or stab 'A' and kill him, this would be justifiable homicide, although 'A' really intended no harm. Other illustrations of the rule will readily suggest themselves. All that the law demands in order to justify an act of self-defense is that there shall be reasonable apprehension of immediate danger, and of the reasonableness of this apprehension the jury are to be the judges.

"*Twenty-sixth.* In deciding the question whether this was a case of justifiable homicide or not, you should first decide the position and condition of the parties when the killing took place, . . . and, in fine, as to all the circumstances of the transaction, and then apply the rules of law herein given you, and say if the defendant's life was then and there in immediate real or apparent danger of being taken, or he was in immediate real or apparent danger of receiving great bodily injury—if he thought so, and if he had reasonable grounds so to think.

"*Twenty-seventh.* . . . And if you find from the evidence that William F. Bleisner did strike the defendant at such time, and that the defendant then fled, and was pursued by said William F. Bleisner and assaulted the defendant in such a manner as to cause him to believe that his life was in danger, or that he was in danger of some great bodily harm, then the defendant would have the legal right to defend himself even to the extent of taking the life of the deceased, and the defendant would have the right to act upon the facts as they appeared to him at the time, as hereinbefore set forth.

"*Thirtieth.* You can not disregard the instructions of the court, as the instructions contain the law of the case and are given for the guidance of the jury, but in considering such instructions they should be taken and considered as a whole, and not one or more instructions taken out and considered here and there unconnected with the others; but they should be considered as to give due weight to all of the instructions so as to harmonize and modify them as a whole when taken together."

The instructions follow very closely, and the objectionable portions of the twenty-third are literally

The State v. Keehn.

copied from, those given in the case of *The State v. Bohan,* 19 Kan. 28. In the Bohan case, however, the trial court went further and made specific application of the general instruction corresponding to the twenty-third as follows:

"But if in such a case the two brothers should attack the defendant, and the defendant was in the imminent peril that I have mentioned from the one only, then he should kill that one only, and not the other. He should go only so far as necessary and do only such acts as were necessary for his own defense. If the two should attack him, and you should believe he killed William first, or disabled him, so he was in danger no longer from him, you should then inquire of the condition of things as between defendant and Thomas, and ask yourselves if it was necessary to kill him also." (p. 33.)

All the argument directed against the instructions in this case were presented in the Bohan case, with a liberal use of italics in the brief. The court said:

"There are some expressions in the charge of the court, which are copied in the brief of counsel for the appellant, that, detached and isolated, as presented to us, seem proper subjects of criticism. But all of this arises from snatching a single phrase from its proper connections, and giving it a special, instead of the general application it had. Taking the context, we find no just ground of complaint. Instructions are to be considered and construed together, as a whole; and if not erroneous when so construed, no one of them will be held to be erroneous." (*The State v. Bohan,* 19 Kan. 28, 55.)

The defense of self-defense always involves two elements—the danger and the means chosen to avert it. To a person assailed these elements present themselves in the form of "What will he do; what must I do?" He is allowed to judge of both matters but his judgment is not conclusive upon either. He has the right to his opinion of the danger as it appears to him, and not as it is as a matter of fact, but his opinion is not

final. The apprehension of danger must be reasonable, and of this reasonableness the jury must judge. He has the right to his opinion as to the means necessary to avert danger, but his opinion is not final. It must be a rational opinion. The same reasonableness must exist here as in the case of apprehension of danger, and of this the jury must judge. The test is, What was necessary to accomplish his object under the circumstances as they appeared to him, rationally considered? The result is, the law of self-defense consists of declaration and limitation, proposition and qualification, which can not be compressed into a single statement and presented all at once. There must be arrangement and sequence. Now it has never been regarded as essential that an instruction, or set of instructions, upon this subject should conform to the rules of rhetoric. It is not indispensable that statement, limitation and supplementary statement should appear in juxtaposition or in any particular order. It is sufficient if all of them clearly appear, and when they do so appear they will be read together for the true scope and sense of each.

Tested by this rule the twenty-third instruction contains a correct statement of the law and is defective only in form. All that is needed, however, to make it unimpeachable in form is to transpose the sentence beginning "He is justified in acting" so that it will follow the sentence ending "he must act rationally," and to connect the two with the adversative conjunction "but." The only question, therefore, is whether or not the jury are to be credited with capacity sufficient to understand the relation of these sentences to each other.

The twenty-second instruction is devoted to the subject of apprehension of danger. The twenty-third discusses the subject of resistance. This discussion is introduced by the declaration that a person assaulted may use such force as at the time reasonably appears to him to be necessary. Not content with this the court

emphasizes the right of such person to judge by appearances and not by facts by stating it again in terms as clear and positive and forcible as any that could have been chosen:

"He is justified in acting upon the facts as they appear to him and is not to be judged by the facts as they actually are."

Having done this it scarcely seems necessary that the court should have repeated the doctrine three times more in the next three sentences, making them read: "The law allows an individual in the defense of his person to use such means as are necessary, under the facts as they appear to him and not as they actually are. In the selection of these means he must of necessity exercise his own judgment, considering the facts as they appear to him and not as they actually are. But he acts at his peril, and if he goes beyond what is necessary to accomplish the object, judging by the facts as they appear to him and not as they actually are, he must abide the consequences."

There are decisions enough in the books holding that in cases like this the jury may have been unable to carry the effect of an introductory fundamental statement into the next succeeding ones; that they may have regarded the various statements as independent, and possibly as contradictory, and consequently that their feeble intelligences may have become bewildered and they may have acted upon the wrong one. However, throughout the instructions the only kind of person hypothesized is one having the right to act upon facts as they appear to him and not as they actually are. The word "he" in the expressions "he may," "he must" and the like refers to just that kind of a person and to no other. The right is presented and illustrated in the twenty-second instruction, is applied in the twenty-sixth, and is again stated at length in the broadest terms in the twenty-seventh. Besides being twice stated at

the beginning of the twenty-third it is recognized in the body of the instruction, and the instruction closes with the words "without a necessity therefor, real or apparent." Therefore the contention of the defendant would seem to involve a "snatching a single phrase from its proper connection and giving it a special, instead of the general application it had" (*The State v.* *Bohan,* 19 Kan. 28, 55), too violent even for a jury, and especially so in view of the express admonition to the jury that the instructions were to be considered in a way to harmonize and modify them as a whole when taken together.

Complaint is made that in the instructions the court used the expression "malice express or implied" and then failed to explain the distinction between express and implied malice. It makes no difference. Malice was fully and correctly defined, and the jury were told that they could not convict the defendant of murder unless they found that the homicide was committed with malice, so that the expression "malice express or implied" could mean to the jury nothing less than actual malice. An instruction was requested telling the jury that the terms "express malice" and "implied malice" are not to be understood as dividing malice into two distinct kinds of natures, that no such distinction exists and that actual malice always is intended, but the refusal to give it did not constitute material error because, as stated, the instructions given could not be interpreted to admit of anything but actual malice.

After the jury retired for deliberation the following proceedings took place, as shown by the journal of the court:

"Thereupon, in open court, in the presence of the defendant and his counsel, it was agreed and consented to by and between the plaintiff and the defendant and consented to by the court, that the judge of the court might return to his home in Troy, Kansas, in said judicial district, and that in the event the jury arrived

at a verdict before the return of the judge of the court, the verdict should be received by Hon. J. E. Taylor, an attorney at law residing in Seneca, Kansas."

The verdict was returned in the absence of the judge, and the journal proceeds as follows:

"Which said verdict was duly received by the said J. E. Taylor, in the presence of the county attorney, and of the defendant, Fred Keehn, and his attorneys. Thereupon the defendant was duly inquired of if he desired the jury polled, to which his counsel answered in the negative, and thereupon, on demand of said county attorney, the said jury were duly polled by the clerk of said court and each juror answered that said verdict was his verdict, and no objection being made to said verdict or to said proceedings by the defendant or his counsel, the said verdict was ordered filed in the office of the clerk of said court and the jury were thereupon discharged from further consideration of this case."

Section 238 of the code of criminal procedure reads as follows:

"When the jury have agreed upon their verdict they must be conducted into court by the officer having them in charge. Their names must then be called, and if all appear their verdict must be rendered in open court. If all do not appear, the rest must be discharged without giving a verdict, and the cause must be tried again at the same or next term."

The argument is that there can be no court without a judge, that the judge can not delegate his authority to another, and that a defendant can not by agreement waive the lawful constitution of the tribunal appointed to conduct criminal proceedings.

The courts generally accept the defendant's view, and occasionally one of them, by process of logic of equal validity with that by which such view is maintained, reaches the conclusion that the accused can not be tried again but must be discharged. Usually it is said that the reception of the verdict is a judicial act (*State v. Jackson*, 21 S. Dak. 494, 113 N. W. 880; *McClure v. The*

*State*, 77 Ind. 287), and starting with this assumption it is easy to deduce the invalidity of a verdict received in the absence of the person who is essential to the organization of a court and who in a sense is the court. When it is suggested that rules of procedure do not constitute an end in themselves but are only a means to an end, and that a violation of a rule of procedure does not always vitiate the result, the reply is usually of the kind made in the case of *Ellerbe v. State*, 75 Miss. 522, 22 South. 950, 41 L. R. A. 569:

"Where the defendant has been, as here, denied a right secured to him by the constitution and the laws of the land, in a matter going to the very constitution of the court trying him, we are compelled to reverse the case. In such cases the interests of society, the stability of the laws, the due administration of justice, demand a reversal. Disregard of fundamental right in the case of the guiltiest defendant, his conviction in violation of settled constitutional and legal safeguards intended for the protection of all, are not things which affect the particular defendant in a given case alone, but, in their disastrous and far-reaching consequences, involve in future trials the innocent and guilty alike, subvert justice and disorganize society. Guilt should be punished certainly and condignly, most assuredly; but guilt must be manifested in accordance with the law of the land, else some day the innocent, who are sometimes called to answer at the bar of their country, may come to find themselves involved in a common ruin and deprived of the legal trial necessary to the vindication of their innocence." (p. 531.)

In the case of *Willett et al. v. Porter et al.*, 42 Ind. 250, the court said:

"Were we to sanction the practice resorted to in this case, in thus substituting, even by the agreement of counsel, the clerk of the court, or some one else, in the place of the judge of the court and hold that such person could legally hold the court, preside at the return of the verdict and during the polling of the jury, receive the verdict, and discharge the jury, we should never know where to stop." (p. 255.)

The argument *ab extremis* ought not to be very terri-fying. It is not necessary to admit that an approval of the verdict rendered in this case would compel recog-nition of a verdict dropped in the mail, or would lead to the toleration of irregular practices to such an extent that the whole fabric of the law and of society would be undermined. If this method of reasoning be valid we are ruined already, because the theory that the re-ception of a verdict involves a judicial act of the court itself is continually disregarded. *"Dies dominicus non est juridicus,"* and no judicial act can be performed on that day. Under the stress of logical consistency it has been held that no verdict can be received on Sun-day, but after the expenditure of a vast amount of learning the common-sense view prevailed that ver-dicts may be received on Sunday, one of the reasons as-signed being that receiving a verdict is a ministerial and not a judicial act. (Bishop, Crim. Proc., 3d ed., § 1001.) If a court be not organized and in lawful ses-sion as a court the mere presence together of the judge, clerk, sheriff, parties, attorneys and jurors no more constitutes a court than if they had assembled about the score board. It has been so decided, but after the ex-penditure of much more learning the common-sense view prevails that to receive a verdict a formal organi-zation of the court, such as is necessary to render a judgment or to perform any other proper judicial act, is not required. In reaching this result some curious reasoning has been employed. Thus it has been said that a verdict may be received after court has ad-journed if the assemblage has not dispersed, because adjournment is an act of separation and departure and not a proclamation. (*Person v. Neigh,* 52 Pa. St. 199.)

The real ground of decisions like the one just cited is the solid one that the forms prescribed for preserv-ing the authenticity of the verdict have been observed and the parties have not been deprived against their will of opportunity to protect their substantial rights;

and whenever this can be said no verdict ought to be set aside, merely to satisfy a theory regarding the constitution and organization of the court.

Interpreting the statute quoted above in the light of this principle, it is not necessary to adhere strictly to the letter of the statute without regard to its spirit and purpose. Calling the names of the jurors, who have all the time been in the custody of a sworn officer, to see that no one has escaped, is reminiscent of the days when, if the jury had not agreed before the judge left town, he might carry them around the circuit with him in a cart. (3 Blackstone, Com. p. 376.) If after the jury has come into court with its verdict counsel for the defendant should announce that he is satisfied the jurors are all present and the roll call should then be omitted, the statute would be violated, but who would contend that the verdict was vitiated? Consistently with the principle, this court decided that a verdict in a capital case, not received in open court but received some hours after an adjournment had been taken until the next day, was valid. The judge, the officers of the court, the defendant and the attorneys for both sides were present, and the proceedings took the ordinary course, without objection. The court said:

"The statute, § 238, code of criminal procedure, provides that a verdict must be rendered in open court. Clearly there was a technical departure from this rule. But § 275, which prescribes the grounds for a new trial, contains nothing which would reach a question like this; and § 293 provides that 'On an appeal, the court must give judgment without regard to technical errors or defects, or to exceptions which do not affect the substantial rights of the parties.' Under these two provisions, we think, the error is not one which will justify a reversal of the judgment. Every substantial right of the defendant was secured." (*The State v. McKinney,* 31 Kan. 570, 584, 3 Pac. 356.)

In the case just cited the court, after considering the authorities to the contrary, adopted the view expressed by Bishop (Crim. Proc., 3d ed., § 1001) and held that

receiving a verdict is not a judicial act. To that view the court adheres, and consequently the question of a delegation of judicial authority is not involved. Whatever right the defendant may have had to invoke judicial action in connection with the reception of the verdict, should occasion arise, he clearly waived. He might have waived attendance at the return of the verdict altogether (*The State v. Way,* 76 Kan. 928, 93 Pac. 159), and in this instance, while the right to be present was not waived, the right to call upon the court for any judicial purpose involved in the proceeding was waived as effectually as if the defendant had chosen to absent himself.

"The consent given in this case was that if the jury agreed upon their verdict, during a brief recess of the court, it should be returned to and received by the clerk, in the absence of the defendant. The verdict under this agreement was returned to and received by the clerk, and the jury discharged. Nothing less can be intended from the consent, than that the verdict if returned to and received by the clerk, during the recess of the court, in the absence of the defendant, and the jury discharged, should be of the same validity and operation, as if all this had occurred in open court, and in the presence of the defendant. . . . Agreements deliberately made as to the conduct and proceedings in the cause, with the sanction of the court, should be enforced according to their spirit and meaning, against defendants in criminal, as well as against suitors in civil cases." (*Brown v. The State,* 63 Ala. 97, 103, 104.)

It is true that this language was used in a misdemeanor case, but it is pertinent here because no distinction is made in this state, as in Alabama, with respect to waivers of the right to be present when the verdict is returned in felony and in misdemeanor cases.

This case is one of the waiver of the presence of the judge at a proceeding involving no judicial action. The court has no hesitation in holding that such a waiver is lawful, and the substantial rights of the defendant were in fact conserved as fully as if the verdict had

been returned in open court with the judge presiding. Therefore he has no just ground to complain.

"The defendants had the right to have the verdict rendered in the presence of the judge, and it is best that it should always be done. But it is certainly competent, except in capital cases, for it to be received by the clerk, if no exception is made and the opportunity is given the defendant to object, 'and such practice is very common.'" (*State v. Austin,* 108 N. C. 780, 785, 13 S. E. 219.)

The case of *The State v. Beuerman,* 59 Kan. 586, 53 Pac. 874, is cited by the defendant. In that case the judge was absent a part of the time while the argument to the jury was in progress, without the defendant's consent. The court said the defendant had reason to complain, but declined to rule upon the question whether prejudicial or reversible error had been committed. The question now under consideration is one of waiver, and as bearing upon that question the court is much impressed with the views expressed by the supreme court of Iowa in deciding that the presence of the judge during the argument of the cause may be waived.

"After the evidence was closed the attorneys for the state and the defendant agreed that the judge might retire to a near-by room for the purpose of preparing his instructions. He did so, and remained out of the courtroom and out of hearing of the proceedings during most of the argument. He was, however, in the courtroom two or three times during that argument. No complaint was made of his absence, and no request made for his return; nor is there any showing of special prejudice on account of his absence. It is not denied that his presence there at that time was waived by the defendant, but it is contended that a defendant in a criminal case can not waive any of his constitutional rights. In the trial of a criminal case the court should always be where he can hear all parts of the trial. It is never safe to be behind closed doors while the trial is going on. But while condemning this practice, we are not prepared to say that a defendant may not legally waive the physical presence of the judge temporarily during the argument of the case, particularly where no

showing of misconduct on the part of attorneys or others in the courtroom is made which would indicate prejudice to the defendant. As has been well said, the sanctity and dignity of judicial proceedings should at all times be maintained; and it seems to be the pretty general holding, where the question has been involved, that the absence of the judge from the courtroom during any part of the time while the trial is progressing may be ground for reversal. . . . It certainly can not be legally said that a court having jurisdiction to try a criminal case will lose it during the trial by the judge temporarily being in another room with the consent of the defendant; and, if this be true, why may not the temporary absence of the judge during argument be waived, and the defendant be bound by such waiver, in the absence of a showing of prejudice? Believing, as we do, that such procedure, under such circumstances, does not deprive the defendant of a trial by due process of law, we are constrained to hold it a matter that the defendant may waive, and that, where there is no showing of prejudice on account of the absence of the judge, we will not reverse." (*State of Iowa v. Hammer,* 116 Iowa, 284, 286, 289, 89 N. W. 1083.)

It is urged that, disregarding the testimony of Mrs. Kahl, who, without doubt, met the deceased just after instead of just before the shot was fired, there is no evidence of malice, and that in other respects the verdict is not sustained by the evidence and is contrary to the evidence. In this connection it is pointed out that the trial judge remarked, in overruling the motion for a new trial, that he did not expect the jury to bring in the verdict it did. After reading the record, this court is frank to say that, in view of the well-known tendency of jurors to look compassionately upon the frailties of their fellow men and mitigate offenses committed under the influences of strong passion suddenly aroused, a verdict of manslaughter would not have been exceptional. The jury, however, evidently refused to credit the defendant's narrative of the encounter, as they had a right to do, and with the defense of self-defense

51—85 KAN.

broken down, every element of murder in the second degree is fully proved.

Minor assignments of error have been duly considered, and none of them justifies a reversal.

The judgment of the district court is affirmed.