No. 20,574.

T. M. SAYLORS, *Appellee*, v. THE STATE BANK OF ALLEN, *Appellant*, et al.

SYLLABUS BY THE COURT.·

1. BANKING—*Honoring Overdrafts—Not Ultra Vires.* It is not *ultra vires* for a bank to agree to honor overdraft checks for a regular customer.

2. SAME—*Contract to Honor Overdrafts—Not Ultra Vires.* When an agreement has been effected whereby certain profits and advantages have been procured by a banking corporation, a defense that the contract was *ultra vires* will not be countenanced to permit the bank to avoid its undertaking pursuant to such contract.

3. SAME—*Stock Buyer—Agreement of Bank to Pay Checks—Agreement Enforceable.* The president of a bank made an agreement with a stock buyer whereby the latter was to purchase live stock and ship them to market and pay for them by drawing checks on the bank. The bank agreed to pay these checks, and was to receive three dollars per carload of the live stock thus bought and shipped, and eight per cent interest on the money used in this business. The returns from the shipments were made to the bank, and the stock buyer's account was credited from time to time with the net proceeds. *Held*, that the bank can not avoid its liability to pay a check given in payment of cattle purchased by the stock buyer pursuant to such agreement.

4. SAME—*Agreement to Honor Overdrafts—Good Consideration.* The consideration for such an agreement between the bank and its customer considered and held sufficient to support the contract.

Appeal from Lyon district court; WILLIAM C. HARRIS, judge. Opinion filed January 6, 1917. Affirmed.

*W. L. Huggins,* and *O. T. Atherton,* both of Emporia, for the appellant.

*W. S. Kretsinger, R. M. Hamer,* and *H. E. Ganse,* all of Emporia, for the. appellee.

The opinion of the court was delivered by

DAWSON, J.: The State Bank of Allen appeals from a judgment in which it was held liable for the face value of a check drawn by a customer of the bank in favor of the plaintiff and which the bank declined to pay. The circumstances which were held to subject the bank to liability on the check may be briefly stated: The village of Allen is situated in a stock-raising district in the northern part of Lyon county. A man by the name of Kelly was one of the local stock buyers. He needed funds with which to do business, and some years ago Kelly and William Hood, president of the bank of Allen, made an oral agreement by which Kelly was to go about the community purchasing live stock, and that he should issue checks on the bank of Allen in payment therefor, and the bank agreed to honor Kelly's checks thus drawn. The cattle were to be shipped to the Kansas City live-stock market and the net proceeds to be credited to Kelly's account, less interest at eight per cent on the sums of money thus used by Kelly, and less also the sum of three dollars per car of live stock, which the bank should receive for financing Kelly's transactions. Pursuant to this arrangement Kelly prosecuted the business of stock buying throughout that community for several years. The bank honored his checks, and usually, but not invariably, exacted its toll of three dollars per car. It does not appear that it regularly or rigidly exacted interest on Kelly's overdrafts, but it always paid his checks according to their mutual understanding except the check which is the subject of this lawsuit.

It appears that in 1915 the bank commissioner began to object to the bank's method of transacting business with Kelly, and some slight changes were made in their mode of doing business. Thereafter the cattle were shipped to Kansas City in the name of William Hood, president of the bank; and at one

time Hood personally loaned Kelly $1000 to extinguish his overdraft and to give him some working capital. In a further effort to satisfy the bank commissioner, the bills of lading for the cattle shipped to Kansas City were attached to sight drafts drawn on the Kansas City consignee for the approximate value of the live-stock shipments, and Kelly was immediately credited by the bank with the sum of each sight draft thus drawn, so that under the new mode of bookkeeping between Kelly and the bank, his overdrafts would not be so large, nor so common, nor continue for several days at a time as was the case when the bank merely carried Kelly's overdrafts until the returns on the shipments arrived from Kansas City. Kelly did not prosper in his stock-buying business, although it aggregated over $400,000 in volume during the years when the bank thus financed his transactions. When his cattle sales in Kansas City did not show a profit the bank did not exact its share of three dollars per car. One time the president of the bank told Kelly that he was paying too much for cattle, and Kelly asked him: "Are you going to quit me?" Hood replied: "No, . . . I will not quit you." ' Kelly said: "Whenever you get ready to quit, let me know in time so that I can quit clear with the people." Hood said: "I will give you plenty of time, we ain't going to quit you."

Thus the relations of Kelly and the bank continued until August, 1915, when Kelly bought twenty-seven cattle from the plaintiff and gave his check for $1880 on the bank of Allen in payment therefor in the usual manner. The cattle, or most of them, were shipped to Kansas City in the name of William Hood, president of the bank, in the usual manner. Some of plaintiff's cattle were traded for others which were shipped in their stead. The plaintiff deposited the check in an Emporia bank and in due course it was presented to the defendant bank where it was dishonored and protested. The bank informed the plaintiff that Kelly's balance in the bank at that time was $905.70 and that if plaintiff would procure a check from Kelly for that sum it would pay it. The plaintiff declined and, having learned later of the arrangement outlined above, brought this action against Kelly and the bank and recovered judgment for the full amount and interest.

The bank appeals, and assigns error: (1) the bank's ar-

rangement to pay Kelly's checks was *ultra vires* and void; (2) no consideration; (3) incompetent evidence; (4) instructions given and refused; (5) that the special findings entitled defendant to judgment.

There is not much merit to the contention that the bank's arrangement to pay Kelly's checks was *ultra vires* and void. Certainly the statute (Gen. Stat. 1909, § 498) which provides that the officer of a bank who pays out the bank's funds on an overdraft is himself personally liable to the bank for such payment does not so declare. That statute simply adds an additional security to the bank for such payments. Chapter 88 of the Laws of 1915, which forbids banks to engage in trade or commerce, does not cover such transactions as those of Kelly and the bank. The bank was not buying and selling live stock. It was furnishing funds—loaning money—to Kelly to engage in this business, and this is one of the principal legitimate functions of banking. We do not understand that even the federal law or its administration puts an absolute ban on overdrafts. And the state bank commissioner's circular letter announcing his intention to coöperate with the comptroller of the currency to restrict the allowance of overdrafts says:

"In future, no overdraft will be allowed with the consent of this department, and if upon any report or examination of any state bank operating under the laws of this state, it is disclosed that any overdraft or cash item has been allowed to continue for a period of ten days, such fact shall be considered evidence of unwise management and shall necessitate more frequent examinations.

"After March 1, 1915, any overdrafts or cash item that has been carried for ten days must be immediately charged from the bank's assets."

It is obvious from the paragraphs just quoted that by the operative interpretation of the chief officer administering our state banking law overdrafts are not illegal, for certainly the bank commissioner did not thus intend to countenance infractions of a positive statute for intervals of less than ten days. The restriction and discouragement of overdrafts is wise supervision of banking and wise bank management, and ordinarily they are only to be tolerated when practiced with great prudence and within narrow limits (Laws 1915, ch. 92), but their absolute prohibition must await further action by the legislature; and an undertaking by a bank to honor an over-

draft by paying the check of a regular customer of the bank for a purchase of cattle which are assigned to the president of the bank and the proceeds of the sale of which are handled by the bank for its protection,- can not be avoided on a specious plea of *ultra vires* nor by the fact that the bank commissioner disapproves the practice of allowing overdrafts. The prudence or lack of prudence in the conduct of the bank concerns the bank commissioner, and the officers, stockholders and depositors of the bank. But the bank's agreement to furnish funds to its customer, Kelly, for legitimate business, concerns those for whose benefit the agreement was made, and the plaintiff was one of the latter. (*Anthony v. Herman*, 14 Kan. 494; *Ballard v. Bank*, 91 Kan. 91, 136 Pac. 935; *Norman v. Rullman*, 93 Kan. 791, 794, 145 Pac. 818; *Bank of Garnett v. Cramer*, 7 Kan. App. 461, 53 Pac. 534; *German Nat. Bank v. Grinstead*, 21 Ky. L. Rep. 674, 52 S. W. 951.)

Viewing this question from another angle, it should be noted that, pursuant to the arrangement between Kelly and the bank by which Kelly's checks were to be honored, the title to plaintiff's cattle passed to the president of the bank, and they were shipped in the latter's name to Kansas City and the proceeds thereof went to swell the bank's assets—to meet Kelly's checks, of course—but nevertheless they became assets of the bank. In such a situation the bank could not escape its obligation to pay Kelly's check for plaintiff's cattle, even if its agreement with Kelly was *ultra vires*. In *Cooper v. National Bank*, 40 Kan. 5, 18 Pac. 937, it was said:

"It is claimed that because the defendant is a national bank it had no right to take this property and agree to turn back the proceeds to plaintiff, and that the cashier, in making this agreement, exceeded his authority. The bank took the property to secure its own claim; it was all personal property, and was not of more than twice the value of the claim to be secured; it received the property, secured its own claim, and then refused to account for the balance. We think if it had the power to take the property and secure its own claim, it ought to have power to pay back the balance to plaintiff. It would be a very strange proposition of law for the bank to receive property upon a chattel mortgage or an agreement to secure its own claim, and not be compelled to account for any balance remaining after its own claim was satisfied." (p. 8.)

The case of *Ballard v. Bank*, supra, is not altogether like the

present case, but is pertinent on the question of *ultra vires,* where it is said:

"It is suggested that the making of such an agreement was beyond the power of the president of a national bank, or of the bank itself. The contract was not immoral or forbidden, and even if when made it was invalid for want of capacity on the part of the officer or of the bank, it was so far carried out that a defense on that ground can not successfully be interposed. (See cases cited in *Harris v. Gas Co.,* 76 Kan. 750, 92 Pac. 1123.)" (p. 97. *Plaster Co. v. Blue Rapids Township,* 77 Kan. 580, syl. ¶ 2, 96 Pac. 68; *City of Emporia v. Telephone Co.,* 88 Kan. 443, 452, 129 Pac. 187; *Hanna v. Railway Co.,* 89 Kan. 503, 508, 132 Pac. 154.)

To summarize this phase of the case, the arrangement between Kelly and the bank was not illegal, though the statute fixes a personal liability on bank officers who pay overdrafts, nor although the bank commissioner requires overdrafts of more than ten days' duration to be charged off. And if an agreement to pay overdrafts was *ultra vires,* the bank could not avoid its agreement to pay them when it had appropriated the consideration for the overdraft checks issued pursuant to such agreement.

The contention that there was no consideration for the bank's agreement to pay Kelly's checks needs little discussion. It was to receive three dollars per car for all live stock purchased and shipped by Kelly pursuant to the understanding between Kelly and the bank. That it did not always exact that sum is immaterial. It exacted that sum on about three hundred and fifty carloads. Kelly transacted about four hundred thousand dollars' worth of business through the bank as a result of this arrangement. Such extensive dealings might well tend to stimulate and develop the bank's general business. These considerations were sufficient. Moreover, the president of the bank took title to the cattle acquired from plaintiff and the bank kept control of the proceeds of the cattle within its own hands. This was another sufficient consideration.

The evidence to which defendant objects reads:

"Q. Mr. Kelly, I wish you would state to the jury whether the agreement that you testified to yesterday, as having been made with the Bank, in January, 1909, was ever changed or modified in substance?

"The defendant objected to the question for the reason that it called for a conclusion of the witness and not a statement of a fact and is incompetent, irrelevant and immaterial, and is not proper rebuttal because fully covered in direct examination.

"Ans. It never was changed."

Having proved the original contract and the conduct of the parties pursuant to it affirmative testimony that it was never changed was unnecessary; but one feature of the defense was that to comply with the requirements of the bank commissioner a change in the mode of business between Kelly and the bank was instituted. On that point the evidence of Kelly was competent as rebuttal, and it was introduced as such. Were it otherwise its introduction would not be fatal. (Civ. Code, §§ 141, 581.)

There was no error in the court's refusal to instruct the jury to return a verdict for the defendant. We have examined the instructions given and refused, and we think those given fairly covered all phases of the controversy, but we discover nothing therein which needs discussion.

A scrutiny of the special findings does not show them to be inconsistent with the general verdict, and the first and most important of these rendered a judgment for the defendant impossible. It reads:

"Q. 1. At the time of the purchase of the Saylors cattle by Kelly and the issuance of the check in controversy, was there a contract between defendant Kelly and defendant The State Bank of Allen to the general effect that defendant Kelly should buy live-stock and draw checks upon the defendant Bank in payment therefor, and that the defendant Bank should pay said checks regardless of the state of the defendant Kelly's account with said defendant Bank? A. Yes."

Whether the bank was to pay all Kelly's checks or only to pay so far as the return drafts for stock shipments would meet was a fair question for the jury and the general verdict has resolved it against the defendant. Nowhere do we find anything substantial or prejudicial on which to disturb this judgment, and consequently it is affirmed.