No. 26,017.

C. N. Fowler, *Appellee*, v. N. F. Shaw, W. H. Colby, C. G. Cochran, J. E. Colby, C. H. Beers, and The Plainville Mercantile Company, *Appellants*.

SYLLABUS BY THE COURT.

1. Corporations—*Consolidation of Mercantile Companies—Liability for Damages to Consolidating Owner—Special Findings*. In an action for damages for depriving plaintiff of his property rights and interest in a mercantile stock and its related assets, the record and special findings of the jury examined, and *held*, that defendants' motion for judgment was properly overruled.

2. Same—*Evidence—Sufficiency*. The evidence to support plaintiff's cause of action was sufficient to sustain the verdict of the jury.

3. Same—*Tortious Acts of Members—Retention of Benefits—Liability*. Where a corporation defendant profited by the tortious acts of individual codefendants who were its officers, directors and stockholders, and did not dis-

1. Corporations, 14a C. J. § 3668.   2. Id., 14a C. J. § 3667.   3. Id., 14a C. J. § 2836; 7 R. C. L. 678, 679.

Fowler v. Shaw.

avow their tortious acts and retained the benefits thereof, the corporation was properly subjected to a judgment in favor of the injured party.

4. Same—*Members and Stockholders—Liability for Corporate Acts.* Record examined and held to contain no substantial basis for imposing liability and judgment on two of the individual defendants.

5. Same. Under the issues and evidence the question of the liability of the other codefendants was for the determination of the jury.

6. Same—*Trial Generally.* Certain incidents of the trial disclosed by the record and noted in the opinion considered and held to present no material error.

7. Same—*Trial—Instructions.* Instructions examined and no error discerned therein.

Appeal from Rooks district court; CHARLES I. SPARKS, judge. Opinion filed November 7, 1925. Affirmed in part and reversed in part.

*W. L. Sayers,* of Hill City, *O. O. Osborne,* of Stockton, and *F. M. Harris,* of Ottawa, for the appellants.

*C. W. Burch, B. I. Litowich* and *La Rue Royce,* all of Salina, for the appellee.

The opinion of the court was delivered by

DAWSON, J.: This was an action for damages against defendants for wrongfully depriving plaintiff of his property rights and interest in a mercantile establishment which had been the subject of a curious bargain between the litigants.

The principal facts will have to be stated at some length:

In 1921 and for some time prior thereto, the plaintiff, C. N. Fowler, was the proprietor of a large mercantile business in Hutchinson, which he conducted through a manager named John Dinwiddie. Fowler himself resided in Salina and had a position with certain fraternal organizations, which occupied his time.

The individual defendants herein were the stockholders of the defendant, The Plainville Mercantile Company, a corporation which had conducted a mercantile business in Plainville for many years.

In 1921 both these business establishments were suffering from the deflation of prices following the world war, and both were being conducted at a loss. The individual defendants were desirous of getting rid of their mercantile company; and on October 17, 1921, they made a bargain in their own behalf and in behalf of their corporation, whose directors, officers and managers they were, as well as owners and holders of all its corporate stock (250 shares), to sell

---

4. Corporations, 14a C. J. § 2837.   5. Id., 14a C. J. § 2985.   6. Trial, 38 Cyc. p. 1316.   7. Corporations, 14a C. J. § 2986.

to Fowler all its merchandise, store fixtures and coal, and its business name and goodwill, and all its capital stock, reserving to themselves its real estate and bills receivable. In consideration of the foregoing, Fowler's part of the bargain was as follows: He was to move all his merchandise and fixtures from Hutchinson to Plainville and merge them with the goods and fixtures of the Plainville company. An inventory was to be taken of the original Plainville merchandise, and Fowler was to be charged therefor at 86¼ per cent of its cost plus 10 per cent for its transportation (presumably from the wholesalers who supplied it), plus $3,000 for the fixtures, and the valuation of all the stock of the corporation, 250 shares, was to be calculated on that basis. The official personnel of the Plainville corporation was to be changed and Fowler was to be elected president; the Plainville company was then to borrow $10,000 from a Plainville bank officered and controlled by two of the defendants, C. G. Cochran and N. F. Shaw, and this money was to be used to pay the debts, claims and taxes due against Fowler's stock of goods in Hutchinson; and it was agreed that the proceeds of all sales of the consolidated mercantile stocks should be devoted as follows:

First, to pay the proper expenses and current charges of the consolidated business.

Second, to pay off the $10,000 indebtedness to be borrowed from the Plainville bank.

Third, to apply 7½ per cent of the gross monthly sales of the business towards the payment of the agreed price for the shares of stock in the corporation at the valuation as determined by the contract, with interest at 8 per cent on deferred payments; but no payments were to be made under this clause until the $10,000 indebtedness was extinguished, and no dividends were to be declared or paid "during the period of this contract nor until the same is fully performed."

Other details of the contract will be noted as we proceed, if they need attention.

Pursuant to this bargain, Fowler shipped his merchandise and fixtures to Plainville, and they as well as the original Plainville stock were separately invoiced. Fowler was elected president of the Plainville corporation; Dinwiddie, whom Fowler had brought from Hutchinson, was appointed manager and placed in charge of the combined stocks and business. The reorganized board of directors borrowed $10,000 from Cochran and Shaw's bank and the debts and

claims against Fowler and his business in Hutchinson were liqui-
dated.  During the next few months Dinwiddie made strenuous
efforts to reduce the indebtedness to the bank, and by special sales
did reduce it from $10,000 to $3,500; but his efforts to conduct the
business satisfactorily to the defendants were not successful, and
on May 15, 1922, Fowler consented to Dinwiddie's dismissal, and
defendant Shaw, who had formerly managed the Plainville company,
was installed by Fowler in Dinwiddie's stead.  Shaw conducted the
business for the next six months, but even less successfully than
Dinwiddie had done.  He increased the mercantile company's indebt-
edness to the bank in the sums of $1,500 and $800.  In apparent dis-
regard of the original contract that the stockholders were not to re-
ceive anything until the debt of $10,000 due the bank had been paid in
full, Shaw on his own behalf and for the other individual defendants
received $987 of the funds of the mercantile company as payment
of interest on the purchase price of the capital stock.  In the autumn
of 1922, Shaw, as vice-president of the bank, caused the bank cashier
to write to Fowler, in Salina, suggesting the advisability of his
raising money to extinguish the bank's debt, and urging him to find
$20,000 to pay off the defendant stockholders; and in one or two
of these letters the bank cashier, also prompted by Shaw, warned
Fowler that his interest in the mercantile company would be for-
feited.  The last of these threats brought Fowler to Plainville,
where, after some futile conversations with Shaw, he demanded
possession of the mercantile establishment, based upon his official
authority as president, and based also upon his rights under his con-
tract of October 17, 1921.  These demands, as well as his demand
for the return of what remained of the Hutchinson stock and fixtures,
were rejected, and this lawsuit followed.

Plaintiff's petition alleged the facts outlined above and exhibited
the lengthy and complicated contract of October 17, 1921, cover-
ing the rights and obligations of the litigants.  The petition sounded
mainly in tort, charging that defendants had deprived plaintiff
of his property and had wrongfully excluded him from possession
of the mercantile stock, assets and business, and had converted
them to their own use.

Defendants answered with a general denial, and alleged that they
entered into the contract of October 17, 1921, in reliance upon
plaintiff Fowler's representations that his Hutchinson stock of mer-

chandise was worth at wholesale prices the sum of $22,771.98 and that the fixtures pertaining thereto were worth $7,500, and that upon the faith of Fowler's representations, and after the Hutchinson stock and fixtures were brought to Plainville and merged with the original Plainville stock, they gave their aid and sanction to the loan of $10,000, which was expended as follows:

| | |
|---|---|
| To pay indebtedness against said Hutchinson stock................ | $8,175.25 |
| To pay taxes due by plaintiff.................................... | 1,256.10 |
| Discount on loan .............................................. | 202.00 |
| Cash credited to said mercantile company........................ | 366.65 |
| Total.................................................. | $10,000.00 |

They also alleged that the freight charges on the goods and fixtures, $375, were paid by the mercantile company.

Defendants' answers also narrated at length certain transfers of stock to qualify Fowler and his son and Dinwiddie for election on the corporation's board of directors, the election of Fowler as president and of Dinwiddie as manager; that defendant C. H. Beers and W. H. Colby, who theretofore had each owned but one share of stock, had surrendered them so that they might be reissued to Fowler and Dinwiddie, and that since that time, about November 15, 1921, Beers and W. H. Colby owned no stock and had no interest in the mercantile company and had taken no part in its concerns.

The corporation's answer further alleged that, neither as president, director nor shareholder, had plaintiff Fowler given the corporation's affairs any attention since November 15, 1921, and that he had always treated the corporation's assets as his individual property. Another allegation of its answer was that the inventory of the mercantile company's goods and fixtures (before the merger), valued at 86¼ per cent of their market price, was $24,682.74. It was also alleged that Dinwiddie and Fowler's son declined to permit any of the defendants to participate in the taking of the inventory of the goods and fixtures shipped from Hutchinson, and that the inventory so taken was secreted and withheld from the inspection of defendants, and that this inventory was taken for the purpose of cheating the defendants, and that plaintiff's representations touching the value of the Hutchinson goods and fixtures were false and untrue, and that the wholesale value of the Hutchinson mercantile stock did not exceed $3,000 and the fixtures did not

Fowler v. Shaw.

have a value exceeding $1,000. Other allegations of the answer told of losses and mismanagement on the part of Dinwiddie and of special bargain sales conducted by him against the advice of the defendants and of losses on goods sold at sacrifice prices.

Defendants prayed that plaintiff take nothing by his petition, and that the mercantile company have judgment for $6,000 from plaintiff on account of his misrepresentations touching the value of the Hutchinson stock and fixtures, and judgment for $6,000 additional on account of losses caused through plaintiff's mismanagement of the Plainville company's business, and judgment was also demanded against plaintiff for divers other sums which need no present attention. The defendants Shaw, Cochran and J. E. Colby, in their answers, adopted most of the allegations of the corporation's answer, and alleged:

"That the said plaintiff is justly indebted to said defendants for interest on $24,682.74 from April 17, 1922, at the rate of 8 per cent, and is also indebted to said defendants for the difference in the present value of the capital stock of said mercantile company and its value on the 17th day of October, 1921, as fixed by said contract, the same being the sum of not less than $6,182.44."

They prayed judgment for these amounts and interest, and—

"That said defendants be restored to all their rights in and to the stock and assets of said mercantile company, and be adjudged to be the owner of all the stock in said mercantile company now standing in their names."

W. H. Colby and C. H. Beers filed verified general denials, and W. H. Colby pleaded that after November 15, 1922, he was not a stockholder and had neither interest nor concern in any of the matters narrated in plaintiff's petition, and denied that Shaw was authorized to act or did act for him.

On issues so broadly outlined, the cause was heard at length. The jury returned a general verdict for $7,500 in plaintiff's favor, and made many findings of fact, viz.:

"ANSWERS OF JURY TO SPECIAL QUESTIONS.

"1. Was the business of the Plainville Mercantile Company conducted at a loss, from October 27, 1921, to May 15, 1922, while the same was under the management of the plaintiff and his agents? Answer: Yes.

"2. If you answer the foregoing question 'yes,' then state whether such loss was of a substantial nature? Answer: Yes.

"3. Was the business of the Plainville Mercantile Company conducted at a loss from May 15, 1922, to October 16, 1922? Answer: Yes.

"4. If you answer the foregoing question 'yes,' then state whether such loss was of a substantial nature? Answer: Yes.

"5. On October 16, 1922, was the value of the assets of the Plainville Mercantile Company approximately as follows (you may state in your answer the several amounts you find):

"*a.* Merchandise including Hutchinson stock, $23,962.16? Answer: $26,462.16.

"*b.* Supplies and coal, $432.80? Answer: $432.80.

"*c.* Accounts receivable, $1,060.79? Answer: $1,060.79.

"*d.* Cash in store, $60? Answer: $60.

"*e.* Cash in bank, $211.61? Answer: $211.61.

"*f.* Value of Plainville fixtures, $2,648? Answer: $2,648.

"*g.* Value of Hutchinson fixtures, $1,400? Answer: $3,600.

"6. On October 16, 1922, were the liabilities of Plainville Mercantile Company approximately as follows:

"*a.* Wholesale accounts, $2,908.81? Answer: $2,908.81.

"*b.* Bills payable, $5,600? Answer: $5,600.

"*c.* Taxes accrued, $973.99? Answer: $973.99.

"*d.* Accrued rent, $75? Answer: $75.

"6 *a.* What if anything do you find was the reasonable value of the plaintiff's interests in the contract in question on October 16, 1922, taking into consideration the conditions of such contract, the assets and liabilities of the corporation, the location of the store, and the indebtedness of plaintiff under the contract? Answer: $7,500.

"7. Was there any appreciable change in the actual net worth of the Plainville Mercantile Company between October 16, 1922, and November 15, 1922? Answer: No.

"8. On October 16, 1922, what amount was owing by plaintiff for purchase price under said contract? Answer: $25,675.22.

"9. Pursuant to the terms of the contract in writing, did the plaintiff during November, 1921, put into the store building and business of the Plainville Mercantile Company at Plainville, Kan., merchandise of the invoice price of about twenty-two thousand six hundred ninety-nine dollars and twenty-three cents ($22,699.23)? Answer: Yes.

"10. Did the plaintiff put into the store building and business of the Plainville Mercantile Company fixtures of the value of five thousand dollars ($5,000)? Answer: Yes.

"11. Was the amount of the inventory of the merchandise and coal of the Plainville Mercantile Company about twenty-one thousand six hundred eighty-seven dollars and twenty-four cents ($21,687.24)? Answer: Yes.

"12. Did the total sales of merchandise for the year commencing October 16, 1921, and ending October 16, 1922, approximate thirty-seven thousand seven hundred dollars ($37,700)? Answer: Yes.

"13. During the period commencing October 16, 1921, until October 16, 1922, was new merchandise of the value of about twenty-two thousand dollars put into the business? Answer: Yes.

"14. Upon October 16, 1922, was there merchandise on hand in the business

of the cost price of approximately thirty-eight thousand seven hundred twelve dollars and twenty-one cents? Answer: No.

"15. Upon October 16, 1922, were there accounts due to the Plainville Mercantile Company in the sum of approximately twelve hundred dollars? Answer: Yes.

"16. Upon October 16, 1922, were there notes owing in the sum of five thousand eight hundred dollars? Answer: Yes.

"17. Upon October 16, 1922, were there accounts owing to the mercantile houses in the sum of approximately thirty-two hundred dollars? Answer: Yes.

"18. Were the fixtures in the store upon October 16, 1922, of the approximate value of seven thousand dollars? Answer: Yes.

"19. Were the total expenses of running the business, including interest, taxes and insurance, from October 16, 1921, until October 16, 1922, approximately fourteen thousand dollars? Answer: Yes.

"20. During the year ending October 16, 1922, were fixtures sold of the approximate value of one thousand dollars? Answer: Yes.

"21. From October 16, 1921, until May 20, 1922, did the Plainville Mercantile Company, through the plaintiff, pay from the proceeds of the business sixty-five hundred dollars and interest on the ten-thousand-dollar note to the bank? Answer: Yes.

"22. From October 16, 1921, until May 20, 1922, did the Plainville Mercantile Company, through the plaintiff, pay on account of new merchandise about $8,500? Answer: Yes.

"23. Were the gross sales of merchandise from May 20, 1922, until October 16, 1922, about $12,800? Answer: Yes.

"24. From May 20, 1922, until October 16, 1922, was merchandise purchased of the cost price of about $10,800? Answer: Yes.

"25. From May 20, 1922, until October 16, 1922, was there paid on account of new merchandise about $10,500? Answer: Yes.

"26. Did the company borrow from the bank fifteen hundred dollars upon September 15, 1922, and give its note therefor? Answer: Yes.

"27. Did the company borrow from the bank the sum of eight hundred dollars and give its note therefor on or about September 5, 1922? Answer: Yes.

"28. From May 20, 1922, until October 16, 1922, was the expense of the business about $5,600? Answer: Yes.

"29. From October 16, 1921, until May 20, 1922, did the Plainville Mercantile Company, through the plaintiff, pay expense in the sum of about $8,400? Answer: Yes.

"30. Prior to the execution of the contract in writing dated October 17, 1921, did the defendants have an inspection made of plaintiff's stock of goods and fixtures at Hutchinson, Kan., for the purpose of ascertaining and determining the quantity, character, and value thereof? Answer: Yes.

"G. A. SUTTON, <em>Foreman.</em>"

Judgment was entered in plaintiff's behalf, and defendants appeal. Before addressing ourselves to the particular matters urged by

defendants it will be well to take note of a few simple features of corporation law. A corporation is a creature of the law; it may be called into existence by the statutes, but only according to the statutes, and it can only act by the statutes. It has a legal entity quite apart from that of its stockholders. It owns its property. Its property does not in any correct sense belong to its stockholders. They have an interest in the corporation's profits if there are any profits to be distributed, but only those profits which are regularly and lawfully ordered to be distributed by the corporation's board of directors. The shareholders also have the right to choose the corporation's board of directors and to make by-laws for its government, but they have no other voice in its management. Neither the shareholders nor the board of directors can sell and dispose of all the assets of a corporation, as such an act would disable the corporation to exercise its corporate functions, and this the law will not allow, except for the one purpose of terminating its corporate life and surrendering its charter. Strictly speaking, no contract made on behalf of a corporation by its shareholders—even by all of them— is of any validity to bind the corporation. A contract to be binding on the corporation must be made by authority of its board of directors, acting as a board and not otherwise, and even a contract authorized by the board is invalid if it relates to a matter which the corporation has no corporate authority to do or perform.

With these rudiments of corporation law in mind, it will readily be noted that the contract between plaintiff and defendants was entered into with no proper regard to their bearing on the subject matter with which they were dealing. The individual defendants could properly agree to sell their shares of stock to Fowler; they could agree to cast their votes to elect him as president and for Dinwiddie as manager; and they could agree to put up their stock in the bank in escrow; and those of their number who were directors could probably agree in advance to vote as directors that the corporation should borrow $10,000 to pay the claims and taxes on Fowler's Hutchinson merchandise, since that property was to become a part of the assets of the Plainville corporation. But neither as individuals nor as shareholders could the defendants, Shaw, J. E. Colby, C. G. Cochran, W. H. Colby and C. H. Beers, jointly or otherwise, lawfully agree to sell to Fowler the merchandise stock of the Plainville corporation *en masse,* together with all its fixtures, its coal, its business name and good will. Only the corporation it-

self, acting by its properly authorized board of directors, could make such a contract of purchase and sale. So, too, the arrangement whereby the individual defendants were to receive as their private property the corporation's real estate and its bills receivable was altogether irregular, and, to speak with technical accuracy, such arrangement was a nullity.

It will thus be seen that the litigants made their contract and set about a compliance with its terms and went so far towards its fulfillment in ignorance or disregard of the principles of corporation law that their respective rights and liabilities are incapable of determination by a precise application of the general principles of corporation law to their situation. We will have to determine whether substantial justice between the litigants was reached by the rules by which they themselves chose to abide—the terms of their contract.

Passing, then, to the particular grievances urged by defendants, it is first contended that defendants were entitled to judgment on the findings of the jury. Our analysis of the findings does not lead us to such a conclusion. For example, by adding up the values of the various assets and deducting the proper liabilities of the mercantile company, as found by the jury, it appears that its assets in October, 1922, were several thousand dollars in excess of what they had been when the bargain was made with Fowler in 1921, although it was conceded on all sides that the business had been conducted at a heavy loss for the entire interval between October 17, 1921, and October 16, 1922. This increase in assets could only arise because Fowler had contributed enough property to the Plainville company to cover the year's total losses and still show an increase in the assets of the Plainville establishment. Defendants argue that on October 16, 1922, the Plainville company did not have enough assets to pay its debts, but they arrive at that conclusion by adding what Fowler owed the stockholders on the purchase price of their stock to the *bona fide,* proper liabilities of the corporation. Such a computation is altogether wrong; furthermore, there was nothing due from Fowler to the stockholders at the time he was excluded on October 16, 1922. Indeed, so far as the defendants were concerned, Fowler was only to pay the bank the borrowed money as speedily as it could be earned out of the business—no faster. The bank might say it was not bound by that agreement—but these defendants agreed to it. Such are the terms of their contract. And certainly there was nothing due defendants on the purchase price of their

shares of stock—and there never would be anything due thereon—until the bank's $10,000 was repaid. When that was accomplished, payments of 7½ per cent of the proceeds of the gross sales of merchandise were to be made and applied on the purchase price of the capital stock—no sooner. Defendants' motion for judgment on the special findings was properly overruled.

It is next contended that the verdict was not sustained by the evidence. This court has read and reread the abstract of 195 pages and the counter abstract of 103 pages and has assiduously studied the briefs, but we discern nothing in these to support this contention. On the contrary, the evidence for plaintiff, and which the jury saw fit to believe, as it had the right to do, tended to show that plaintiff brought to Plainville a stock of goods worth about $22,-699.23 and fixtures worth about $5,000 and placed that large amount of property into the Plainville establishment to swell its assets, at a cost of $10,000 to the Plainville concern in liquidation of the claims and taxes constituting Fowler's liabilities in Hutchinson. This was a net gain in assets to the Plainville company of $17,699.23. And yet in less than a year Fowler was told that unless he personally raised the money to pay the bank in full and to pay off the defendant stockholders his interest in the business and all his rights under the contract would be forfeited. On September 22, 1922, Shaw prompted the bank cashier to write:

"I am still of the opinion in case you are not able to make a deal by December 28, that it will mean all your equity is worth to you personally to give up the whole proposition and divert your efforts to some other channel where you can work better and perhaps you can accumulate or make back what this deal has lost you."

And on October 12 the cashier wrote:

"On October 16 your contract with them will be five months past due; or, in other words, he [Shaw] has given you that length of time to make some kind of change, and he does not feel that you are giving him a square deal. Unless he hears from you by that time with a definite proposition it is his plan to terminate the contract, and you will then of course forfeit whatever interest you might have."

It is useless to address an argument to this court that Fowler's Hutchinson stock was "shopworn," and that it "had many obsolete, unmerchantable goods, entirely out of date and unsalable," and not worth nearly its invoice value. That argument spent its force when the inconsiderable evidence to that effect was weighed and discredited by the jury. The trial court and jury constitute the

fact-finding tribunal, not the supreme court. (*Agricultural Ins. Co. v. Ætna Ins. Co.*, 119 Kan. 452, 457-459, 239 Pac. 974, and citations.) Indeed, if we should consider the testimony ourselves it would be difficult to yield credence to defendants' evidence that the Hutchinson stock and fixtures were worth no more than $10,200, and perhaps less. Shaw testified: "Mr. Fowler said he had a good stock at Hutchinson and that he had gotten it down to something over $30,000." Again Shaw testified:

"Q. Now at the time you first met Mr. C. N. Fowler, in Plainville, at the time you have stated, were there any negotiations taken up, by you and he, with reference to the execution of any sale of that property? A. Just a little. I had advertised the business for sale in the *Merchant's Journal,* and one morning Mr. Fowler came in and talked a little, and finally told me that he was in business at Hutchinson and had forty-thousand-dollar stock there and had thought some of .making a change there, and we talked generally about that, but there was no definite propositions made at that time."

He also testified that he sent his son-in-law to Hutchinson to inspect Fowler's stock, and the latter reported that he "wouldn't consider it worth over ten thousand dollars."

"Q. Now, you sent Colby down to look at this stock of goods at Hutchinson, didn't you? A. I asked him to go.

"Q. And he was a merchant of many years of experience, was he not? A. He had had a good deal of experience.

"Q. He had run a store at Plainville? A. Yes.

"Q. And for how many years? Oh, I don't know; ever since he was a little boy.

"Q. Well, a good many years? A. Yes.

"Q. And he has been a .merchant in Ottawa since leaving Plainville? A. Yes.

"Q. And he is your son-in-law? A. Yes.

"Q. And you had confidence in his judgment? A. I did.

"Q. And in his truth and veracity? A.. I did; yes, sir."

It would thus appear, according to Shaw's testimony, that notwithstanding the gross discrepancy between Fowler's statement that he had a $30,000 or $40,000 stock in Hutchinson and Shaw's trusted son-in-law's estimate that it was not worth over $10,000, yet Shaw, the experienced merchant, banker and trader, acting for himself and his codefendants, consummated a bargain with Fowler in which he gave his sanction that the Plainville corporation should borrow $10,000 in cash to pay Fowler's debts! And Fowler was a comparative stranger who had just misrepresented to Shaw the value of his assets to the extent of $20,000 or more! And this, too, at a

time when mercantile stocks were a drug on the market, in a period of deflation and financial distress! Small wonder the jury gave no credence to that sort of testimony when there was ample evidence to support plaintiff's evidence touching the value of his Hutchinson stock. That evidence included consistent testimony that J. E. Colby did in fact report to Shaw that the Hutchinson stock was worth $20,000 to $25,000.

But it is urged that there is no evidence on which to rest a judgment against the corporation itself. As we have already pointed out, neither party to this litigation paid much attention to the independent legal entity of the corporation and its rights and liabilities when they were making their bargain. But the defendants were the officers, directors, and the only stockholders of the corporation, and they chose to act for and to bind it, and while technically speaking they could only act for the corporation through a resolution of its board of directors, yet they did act and contract in its behalf as well as on their own behalf, and pursuant thereto the defendant corporation obtained plaintiff's mercantile stock and fixtures worth $27,699.23, for which the corporation paid out $10,000 in plaintiff's behalf, and paid out $987.30 as interest [or dividends?] on the specified price of the total capitalization. That left the corporation as a beneficiary to the extent of nearly $17,000 as a result of the acts of the other defendants in excluding Fowler from his rights under the contract and stripping him of his property. The corporation never disavowed the acts of the individual defendants, and it still retains all it acquired from Fowler by the bargain to which it was made a party. It has never pleaded a defense of *ultra vires* in this action, and under the circumstances such plea would be unavailing. In *Kelly v. Insurance Co.*, 101 Kan. 91, 98, 165 Pac. 806, it was said:

"A long line of well-considered decisions has committed this court to the liberal view that a corporation may not avoid its obligation on a plea of *ultra vires* when it has appropriated the consideration or received the benefits of it, and when the party seeking to enforce the obligation has fully performed his share of the undertaking. (*Cooper v. National Bank,* 40 Kan. 5, 18 Pac. 937; *Town Co. v. Morris,* 43 Kan. 282, 23 Pac. 569; *Town Co. v. Russell,* 46 Kan. 382, 26 Pac. 715; *Town Co. v. Lincoln,* 56 Kan. 145, 42 Pac. 706; *Railroad Co. v. Johnson,* 58 Kan. 175, 48 Pac. 847; *Opera House Co. v. Loan Association,* ante, p. 76, 53 Pac. 761; *Harris v. Gas Co.,* 76 Kan. 750, 92 Pac. 1123; *Saylors v. Bank,* 99 Kan. 515, 519, 520, 163 Pac. 454, and cases cited; *Bank v. Wilson,* ante, p. 72; *Maine v. Casserly,* 67 Cal. 127, 7 Pac. 426; 10 Cyc. 1056-1067; 7 R. C. L. 677-681.)"

There is more merit in the contention that defendants C. H. Beers and W. H. Colby should not be held liable. They did surrender their single shares of stock at the time the contract of October 17, 1921, was made, and there is no evidence in the record that they participated in any of the subsequent occurrences which formed the basis of plaintiff's cause of action. Nor was it shown that Beers or W. H. Colby authorized or sanctioned the acts of Shaw in depriving plaintiff of his possession or interest in the property or that they profited directly or indirectly thereby.

We cannot say as much, however, for the argument that J. E. Colby and C. G. Cochran should likewise be relieved of liability. The evidence inherent in all the circumstances tended to show that Shaw was acting for them and with their sanction in all he did to the prejudice and damage of plaintiff. Cochran and Shaw were heavy stockholders in the mercantile company. To get rid of that concern, as its stockholders and directors or at least as its vendors, they assured plaintiff the bank controlled by Cochran and Shaw would loan the mercantile company $10,000, knowing that this sum could only be repaid from the earnings of the company. They knew there was no other source to look to for repayment. Indeed, nobody but the business concern itself was really obligated to repay. Yet apparently to force Fowler out of the corporation and to forfeit all his interest in it and in his contract, Cochran's attitude and his intimate business relationship with Shaw in the bank and in the mercantile business, as well as Shaw's acts made in his behalf, which Cochran apparently ratified and certainly did not disavow, presented a situation and circumstances which made it impossible for the trial court or this court to say as a matter of law that Cochran was not liable. The question of his liability was a fair one for a jury to settle.

Nor do we see how the judgment can be modified to relieve J. E. Colby. He participated in the original transaction; he did his part to carry it into execution. He investigated the Hutchinson stock and reported favorably upon it to consummate the contract, and later repudiated and denied making such favorable report, and avowed that he made an unfavorable one. He did not even plead that Shaw was not authorized to act for him, and his answer adopted the defense pleaded by the corporation. The jury might fairly believe from his denial of his original favorable report, and from his evasive and uncandid attitude at the trial, that he was even

at that late date still abetting and approving the wrongdoing of Shaw in dispossessing and excluding Fowler and in converting Fowler's property to the use of the corporation and to the benefit of these defendants. At all events, the personal innocence of J. E. Colby was not so clear that we can say there was nothing shown against him to justify the jury's verdict against him.

Error is urged in overruling defendants' motion to set aside finding No. 6a in which the jury found the value of plaintiff's interest at the time of the exclusion and conversion to have been $7,500. Possibly—even probably—all the evidence which the jury believed might have justified a much higher sum, but defendants themselves do not urge that objection to it. Moreover, the record does not demonstrate that a higher sum or no sum at all was the only sort of verdict the evidence would have supported. Considering the nature of the evidence, the finding was not without substantial support, and not demonstrably at variance with the evidence, and the point urged does not constitute error. (*Graves v. Negy,* 114 Kan. 373, syl. ¶ 5, 219 Pac. 286.)

Complaint is made against the attitude and ruling of the trial court while J. E. Colby was on the witness stand. Colby testified that when he inspected the Hutchinson stock he estimated its value to be $10,200. On cross-examination he was asked if he did not tell C. V. Lewis in Salina on the day the parties met and made their bargain that Fowler's Hutchinson stock was worth $24,000 or $25,000. He fenced and evaded a direct answer, not denying it, but saying only that he had no recollection of it, that he would not swear positively. More than twenty questions were put to him to elicit a direct and candid answer without avail. The incident, in part, reads:

"Q. Will you swear to that positively that you didn't tell him you examined that stock and that it was worth twenty or twenty-five thousand dollars? A. I have no recollection of that.

"Q. Just answer that question. You know what perjury is, and I am laying the ground of perjury charges for you. Did you tell him that, that day?

[Counsel for defendants]: "Move to strike out that question; that statement is an insult. Move to strike it out and have that statement withdrawn from the jury.

"The Court: Overruled. It can be laid any time for a witness that is not telling the truth. I am not meaning any reflection on this witness or on any other witness, but when a witness does not tell the truth, if it is as to a material fact, he has laid the ground for perjury."

This incident discloses no error. If the trial court perceived that the witness was manifestly attempting to evade a direct and positive answer merely to avoid the consequences of perjured testimony, the trial court's remark was temperate and restrained, certainly very far from prejudicial. (*State v. Hanger*, 108 Kan. 115, 193 Pac. 1052.) Even in a criminal case, it has been said:

"Where the court in the exercise of its sound discretion finds it necessary to send a refractory witness to jail for evading a direct and candid answer to a competent question, no error is thereby committed in derogation of the rights of a defendant on trial at the time." (*State v. Marshall*, 95 Kan. 628, syl. ¶ 1, 148 Pac. 675.)

The record also contains some remarks of the trial court directed at one of defendants' attorneys who had committed a slight *faux pas* by contradicting a witness on the stand and asserting he was mistaken in a statement he had testified to. This brought a sharp rebuke from the court:

"The Court: You are not the record in this case. It is not for you to say whether or not he said that. I don't want any more statements of that kind made by any attorney in this case. You are not to determine what the witness said on the witness stand. I rather think you are not correct about that.

[Counsel for defendant]: "I would like to have, during the noon intermission, the notes of the stenographer.

"The Court: It doesn't make any difference about that. You said he said it, and it is not for you to say that."

The trial was an unusually tedious and protracted one, taking about ten days or more to present the evidence to the jury. Incidents like the above will happen, but it is seldom worth while to reproduce them for airing in a court of review. They seldom disclose reversible error; this incident does not—far from it.

Another error formally assigned relates to the exclusion of part of a letter from Fowler to Shaw which discussed Fowler's prospects of selling or trading the Plainville store for land. This letter was scarcely relevant, and quite immaterial to the issues involved.

Finally it is urged that the trial court erred in instructing the jury that if they found that on and prior to October 16, 1922, plaintiff had applied the gross sales of the business, *first* to the payment of the running expenses of the business, and *then* to the payment of said $10,000 obligation, and [*then*] upon the semiannual interest due upon said consideration and purchase price of said property, upon the request and with the consent and acquiescence of the de-

fendants, then plaintiff was not in default, under the terms of the contract, on October 16, 1922. This instruction was correct, unless it required somewhat too much of plaintiff to be free of default, for it is not at all clear that defendants were to receive any interest on the purchase price of their stock until the $10,000 indebtedness to the bank was wholly liquidated. Defendants also complain of the seventh instruction which reads:

"7. If you find from the evidence that upon October 16, 1922, the plaintiff had not defaulted in relation to the contract as heretofore stated in these instructions; that the defendants or any of them personally or through their duly authorized agent had the actual possession of the books of said corporation, and the property and business thereof, and upon demand by the plaintiff refused to surrender to the plaintiff the books of said corporation and its property and assets, then such defendant or defendants is liable to the plaintiff for whatever damages, if any, you may find him to be entitled to under the evidence and these instructions. The plaintiff was not required to commit a breach of the peace to recover possession of such property and business; and he was not required to institute legal proceedings for the recovery of said property and business; and such acts on the part of such defendant or defendants should be considered by you as to such defendant or defendants as a wrongful appropriation and conversion of such property and business."

To show error in this instruction defendants recur to the technical right of the corporation to all this property; but a corporation can only act through human beings, its officers, agents and employees, and the rights of the defendant corporation were neither greater nor less nor different whether Fowler was in possession and control or Shaw and his codefendants were in possession and control. The contract provided that Fowler was to have everything belonging to the corporation except what the individual defendants appropriated to themselves—its real estate and bills receivable as of October 17, 1921. The contract was so construed by the parties themselves. It was only some months afterwards that defendants sought to give another construction to the contract, to read into it a right to forfeit Fowler's interest, to take from Fowler those rights of possession and control they had once conferred upon him. When defendants sought to be relieved of their interests and responsibility for the management of the mercantile establishment in a period of financial stringency and deflation of prices they made no difficulties about the technical right of the corporation to the possession of its assets. At that time they agreed, according to the contract, "to sell, transfer and convey" to Fowler "all the mer-

Ruckel v. Metropolitan Life Ins. Co.

chandise, fixtures and coal together with the name and goodwill of the company." This language was variously repeated in the contract. True, at its conclusion the contract does provide that it was to be "regarded and construed as an optional contract of sale and purchase, uncompleted and unfilled, until the full and final performance of all the terms and conditions thereof." Just what that might mean is one of the many obscurities of this remarkable contract, but it was not so far "uncompleted and unfilled" that we must grope for an interpretation of plaintiff's right to possession of the property and business, either as president or as optional purchaser, or both, for the defendants had so construed his rights themselves when they installed him in possession in 1921, and consequently they committed a tort when they excluded him in 1922.

A patient consideration of this case discloses nothing approaching reversible error, except on the single matter of subjecting C. H. Beers and W. H. Colby to liability for the tortious acts of the other defendants. As to these two defendants the judgment is reversed, and in all other respects it is affirmed.

Burch, J., not sitting.