No. 27,644.

THE STATE OF KANSAS, *Appellee*, v. M. L. MILLER, *Appellant*.

(270 Pac. 610.)

Opin-
ion filed October 6, 1928.

*Elisha Scott,* of Topeka, *Charles D. Ise* and *M. D. R. Cox,* both of Coffey-ville, for the appellant.

*C. W. Mitchell,* county attorney, and *Theodore F. Varner,* assistant county attorney, for the appellee.

The opinion of the court was delivered by

DAWSON, J.: Defendant was convicted of the penal offense of making an illegal sale of morphine and appeals, assigning three errors, viz.: Prejudicial remarks of the court in the presence of the jury, improper questions propounded to defendant by the trial court, and overruling defendant's demurrer to the state's evidence.

It will make for brevity to consider the last of these points first. The evidence for the state tended to show that defendant is a licensed physician in Coffeyville. One evening in July, 1926, three deputy sheriffs and one Parvin, a narcotic addict, went to Coffeyville in a Ford touring car for the purpose of apprehending persons who were dealing in narcotics in violation of law. One of these deputies, L. M. Clubb, pretended to be a drug addict. The other deputies called on defendant and informed him their associate, Clubb, was suffering for want of morphine. Defendant said he had nothing but the "cube" variety, and wanted $20 for a cube, but said he could get two "squares" at $5 each. The deputies gave defendant a twenty-dollar bill. He went into his house and returned with ten dollars in change which he gave them, and told them they would

find the morphine in a wagon at some distance up an alley, which they did. Defendant's own testimony was not greatly at variance with the foregoing. He said the deputies made him believe their associate was a drug addict who was about to die for want of some "dope.", Clubb was disguised as a "dope fiend." Defendant said he had a patient, Robinson, who let him have two cubes which he agreed to sell for $10. Defendant's testimony continued:

"He went back and told the patient in the office to get the morphine and deliver it in a wagon in the alley, and then went back to see the men in the Ford car, to examine the man to see if he really needed the morphine. They refused to let him examine the man, and the defendant became suspicious and refused to have anything further to do with the case, but showed them where the morphine was."

Cross-examination:

"Q. Why didn't you on this occasion when you were going to alleviate a man in great physical pain and distress, give him a prescription on a drug store, instead of going to this man Robinson whom you knew was not a doctor or dentist? A. The law is so strict with regard to writing prescriptions for addicts at all, I absolutely refused to write one. . . . I absolutely refused to write a prescription on account of the legal technicalities involved in physicians' writing prescriptions for addicts.

"Q. Is there any difference in making out a prescription for morphine than it is for any other kind of medicine? A. Materially different.

"Q. Do you have to do anything more than just sit down with pen and ink or a pencil and write it out? A. I am not supposed to write prescriptions out for addicts.

"Q. Whether it is for addicts or not? A. I can write prescriptions for anybody for morphine if I will comply with the law, providing I will mix that so it cannot be used for dope."

The statute under which defendant was prosecuted is R. S. 65-615, 65-616, 65-617, 65-618, which forbids the sale of opium, coca leaves, etc., and their derivatives, one of which is morphine, under appropriate penalties. The statute does contain an exception relating to the privilege of physicians, dentists, veterinary surgeons and pharmacists to deal in these drugs in the course of their professional practice. But, aside from this exception, a physician has no more right to sell this contraband stuff than any other person. Defendant virtually confessed the crime charged against him when he admitted that he sold or supplied the morphine for pay without conforming to the requirements of the statute (R. S. 65-616), the pertinent part of which reads:

". . . That such physician, dentist, or veterinary surgeon shall keep a record of all such drugs dispensed or distributed, showing the amount

dispensed or distributed, the date, and the name and address of the patient to whom such drugs are dispensed or distributed, except such as may be dispensed or distributed to a patient upon whom such physician, dentist or veterinary surgeon shall personally attend; and such record shall be kept for a period of two years from the date of dispensing or distributing such drugs, subject to inspection, as provided in this act."

In view of the foregoing it is perfectly obvious that the trial court committed no error in overruling the demurrer to the state's evidence.

Exception is taken to certain remarks of the court. When defendant was on the witness stand in his own behalf he repeatedly avoided answering questions put to him by the county attorney, and in lieu thereof frequently replied by giving his idea of what the law was which governed the dispensing of morphine by a physician. This the court strove to prevent him from doing and rebuked him for doing. The following excerpts from the record will develop the point:

[Defendant, testifying]: "A. When these men refused to let me examine this man, I grew suspicious and began withdrawing from the case. When they refused to allow me to examine this man, then I withdrew from the case as a physician. A doctor is considered a man's physician. . . .

"BY THE COURT: I will tell the jury what the law is.

"COUNTY ATTORNEY: Q. What wholesale house do you get morphine from when you use these blanks?

[Counsel for defendant]: "To which we object; incompetent, irrelevant and immaterial, and not within the issues of this case.

"BY THE COURT: If he is a duly licensed, registered physician he can get morphine, but he has got to get it in a certain way. If he is getting it from Tom, Dick and Harry, he is getting it unlawfully, he has unlawful possession of it. It is very material. If he has never received any from a legitimate source, then the source that he did receive it from must have been unlawful, and he has it in his possession unlawfully. A registered licensed physician can't go out to Tom, Dick and Harry and get morphine. . . .

"COUNTY ATTORNEY: Q. Have you written any prescription on a drug store there in Coffeyville for morphine? . . . A. I wrote a prescription for morphine day before yesterday, but it was in a different form. I didn't know whether he meant morphine or sulphite or what.

"BY THE COURT: Oh yes, you do; that question is just as plain as the nose on my face; you doctors can answer these questions if you want to.

"Q. Whenever you give a person a prescription for morphine do you make the prescription out in duplicate, Doctor? A. The law don't require it.

"BY THE COURT: He didn't ask you what the law required.

"A. No.

"BY THE COURT: Well, say so then. You seem to know more law than medicine; let me tell them what the law is. . . .

[Counsel for defendant]: "The law says that a doctor can use it in his own capacity as a physician.

"By the Court: Sure, but he must get it in the proper way.

[Counsel for defendant]: "I would like to have the court excuse the jury.

"By the Court: No, I don't want to talk to you about it; I know what the law is; the law says you must get it in a certain way.

[Counsel for defendant]: "You are assuming that the doctor got it in an unlawful way.

"By the Court: No, you are assuming something—sit down—sit down.

[Counsel for defendant]: "I have a right to think.

"By the Court: Don't think out loud if you are going to think like that. I am just trying to find out from this doctor if he knows how to handle narcotics."

Defendant's counsel cite cases to show that the foregoing constitutes reversible error. Of course there are such decisions; but they are mostly old cases, and not Kansas cases—certainly not recent ones. (L. R. A., n. s., 1916A, 1191 *et seq.*) In the enforcement of the prohibitory law the courts of this state have been compelled to accord scant charity to the old-fashioned practices of indirection, evasion, and special pleading on the part of clever, shifty witnesses, especially defendants who turn advocates in their own behalf when they are on the witness stand. And no logical justification can be made to permit greater latitude for gratuitous and impertinent responses on the part of a defendant in a drug-selling charge than in a liquor case. On the power of the court to hold witnesses within bounds and develop all the pertinent facts, see *State v. Keehn,* 85 Kan. 765, 118 Pac. 851; *State v. Marshall,* 95 Kan. 628, 148 Pac. 675; *State v. Hanger,* 108 Kan. 115, 103 Pac. 1092; *State v. Ketter,* 121 Kan. 516, 247 Pac. 430. See, also, *Burns v. Clark,* 105 Kan. 454, 185 Pac. 27; and *Fowler v. Shaw,* 119 Kan. 576, 590-591, 240 Pac. 970.

On the error based on the cross questions asked by the court, little need be said. Those questions were prompted by the defendant's gratuitous and repeated avowals on the witness stand that he did not and would not conform to the law governing the disposal of morphine by physicians. In *State v. Keehn,* 85 Kan. 765, 118 Pac. 851, it was said:

"The purpose of a trial in a criminal case is to ascertain the truth of the matters charged against the defendant, and it is a part of the business of the trial judge to see that this end is attained. He is a vital and integral factor in the discovery and elucidation of the facts, and whenever in his

judgment the attorneys are not accomplishing the full development of the truth, it is not only his right but it is his duty to examine and cross-examine the witnesses. The presumption is that this liberty will be honorably and impartially exercised in the interest of justice, and in this case it was not abused by the trial judge." (Syl. ¶ 4.)

Nothing approaching the gravity of reversible error is suggested in this appeal, and the judgment is affirmed.