No. 28,197.

THE STATE OF KANSAS, *Appellee*, v. M. L. MILLER, *Appellant*.

(274 Pac. 245.)

Opinion filed February 9, 1929.

*Elisha Scott* and *Randal C. Harvey*, both of Topeka, for the appellant.

*C. W. Mitchell*, county attorney, and *Theo. F. Varner*, assistant county attorney, for the appellee.

The opinion of the court was delivered by

HOPKINS, J.: The defendant is a licensed physician and holder of a permit from the United States revenue department to dispense narcotics. He was arrested, charged with and convicted of unlawful possession of morphine, and appeals.

Section 1 of the narcotic statute contains this language:

"It shall be unlawful for any person to keep or have in his possession or

under his control for personal use or otherwise, any opium or coca leaves, or any compound, salt, derivative or preparation thereof, and such possession or control shall be presumptive evidence of a violation of this section." (Laws 1927, ch. 241.)

There was evidence substantially to the effect that on October 18, 1927, the defendant was observed going down an alley behind a garage near his house, with a package under his arm which had the appearance of being the inner tube of an automobile; that he stopped, stooped over among some weeds and appeared to be scratching in the leaves; that after he had left, those who had observed him immediately investigated the place where he had stooped and found under some boards and rubbish a package consisting of a tin can inserted into a section of a rubber inner tube. In the can were a number of cubes of morphine.

The defendant contends that the statute does not condemn mere possession of narcotics by a physician; that he did not have a fair opportunity to meet the charges on which he was convicted and that the trial court·abused its discretion in assuming the rôle of prosecutor.

Section 2 of the narcotic statute reads in part:

"Nothing contained in this section shall apply to the dispensing or distribution of any of the aforesaid drugs to a patient by a physician, dentist or veterinary surgeon registered under the laws of the state of Kansas, in the course of his professional practice only."

Considering only pertinent parts of the statute, it appears to be unlawful for any person to possess opium derivatives, except physicians (and certain other named classes) as "hereinafter provided." But the act fails to provide thereafter, in express terms, how a physician may lawfully possess such drugs. The defendant argues that if there is nothing "hereinafter provided" expressly as to possession, a physician may have an unlimited quantity of narcotics in his possession for any purpose he desires, as long as he observes certain formalities in dispensing them. In our opinion this ·does not follow. A legislative intent may be ascertained from an examination of the entire statute. . (36 Cyc. 1131-1183.)

Section 2 of the act further provides that it shall be unlawful for any person (whether in the excepted class or not) to have possession of narcotics unless certain federal regulations are complied with.

"Every person who shall give an order as herein provided to any other

person for any of the aforesaid drugs, shall at or before the time of giving such order, make or cause to be made, a duplicate thereof, on a form to be issued in blank for that purpose by the commissioner of internal revenue, and in case of the acceptance of such order shall preserve such duplicate for said period of two years, in such a way as to be readily accessible to inspection by the officers, agents, employees and officials hereinbefore mentioned." (Laws 1927, ch. 241, § 2.)

That is to say, physicians are excepted from the general prohibition, provided, (a) that they have complied with the federal regulations, and (b) that their possession is for use in the course of their practice only. The act provides regulations and prescribes the use of federal forms both for the obtaining and the selling or giving away of such drugs, but the exception is that "nothing contained in this section shall apply to the dispensing or distribution of any of the aforesaid drugs to a patient by a physician . . . in the course of his professional practice only." The federal regulations and forms as to dispensing and distribution of drugs are not required of physicians in the course of their practice only, but no exception is made as to the method by which physicians must obtain their narcotics. We think the following conclusions may fairly be deduced as to the legislative intent:

First: It shall be unlawful for any person to possess narcotics, except certain designated classes under certain named regulations.

Second: Certain designated classes may possess such drugs, but to do so they must comply with specific regulations, including the use of federal forms.

Third: If these regulations are complied with, physicians, as one of the excepted classes, may lawfully possess narcotics.

Fourth: But the possession by a physician, even after he has complied with the regulations and used federal forms, is not lawful unless for the purpose of use in the course of his practice.

The information charged the unlawful possession of opium derivatives. The defendant attempted to meet the charge by denying possession of the can and by showing that he was a licensed physician. The state made a *prima facie* case, and it then devolved upon the defendant to show some reason why he should come under an exception to the general prohibition because possession or control is presumptive evidence of a violation. Three conditions had to be met before his possession was lawful: (1) That the drug had been regularly obtained by the use of federal forms. (2) That

the defendant was a licensed physician. (3) That the morphine was owned for the purpose of use in defendant's medical practice.

The defendant attempted to prove only the second condition, and in that respect failed to rebut the presumption created by his possession. He complains that he was tried on other charges than those set out in the information. This complaint is directed at a rather extensive cross-examination of the defendant, conducted largely by the court. In *State v. Keehn*, 85 Kan. 765, 118 Pac. 851, it was said:

"The purpose of a trial in a criminal case is to ascertain the truth of the matters charged against the defendant, and it is a part of the business of the trial judge to see that this end is attained. He is a vital and integral factor in the discovery and elucidation of the facts, and whenever in his judgment the attorneys are not accomplishing the full development of the truth it is not only his right, but it is his duty, to examine and cross-examine the witnesses. The presumption is that this liberty will be honorably and impartially exercised in the interest of justice, and in this case it was not abused by the trial judge." (Syl.)

In *State v. Miller*, 126 Kan. 578, 270 Pac. 610 (same defendant) it was said in the opinion:

"In the enforcement of the prohibitory law the courts of this state have been compelled to accord scant charity to the old-fashioned practices of indirection, evasion and special pleading on the part of clever, shifty witnesses, especially defendants who turn advocates in their own behalf when they are on the witness stand. And no logical justification can be made to permit greater latitude for gratuitous and impertinent responses on the part of a defendant in a drug-selling charge than in a liquor case. On the power of the court to hold witnesses within bounds and develop all the pertinent facts see *State v. Keehn*, 85 Kan. 765, 118 Pac. 851; *State v. Marshall*, 95 Kan. 628, 148 Pac. 675; *State v. Hanger*, 108 Kan. 115, 103 Pac. 1092; *State v. Ketter*, 121 Kan. 516, 247 Pac. 430. See, also, *Burns v. Clark*, 105 Kan. 454, 185 Pac. 27; and *Fowler v. Shaw*, 119 Kan. 576, 240 Pac. 970.

"On the error based on the cross questions asked by the court, little need be said. Those questions were prompted by the defendant's gratuitous and repeated avowals on the witness stand that he did not and would not conform to the law governing the disposal of morphine by physicians." (p. 581.)

The following testimony by the defendant in the instant case is a fair sample of how he explained to the court and jury his possession of the prohibited drugs:

"Q. Have you made any purchase of morphine since June 24, 1926? A. I don't think I have.

"Q. You could not tell the jury whether you have or have not? A. No, sir; I don't swear to it.

"Q. You won't swear to it? A. No, sir.

"Q. But you will swear if that is morphine in that can that they introduced, if that is morphine you will swear that you never had any blank, any duplicate for that? A. Judge, I don't know anything about that. Now, Judge, you can take morphine—

"Q. I am not asking you that—you will swear that you never made any duplicate for that in that can, if that is morphine, you don't pretend to say that? A. I am not going to swear to something I don't know; I let them have it from time to time.

"Q. You don't mean to say that you ever let them have any of that in that can? A. No, sir.

"Q. You say that is not yours? A. I don't know anything about that.

"Q. Can you say positively that you never had any duplicate for that? A. I have a duplicate for all the morphine I have in my possession.

"Q. You won't answer it that way? A. If you are just going to make me say something to incriminate myself—

"Q. No, I don't want you to do that; if you don't want to answer the question you don't have to answer any question, but you won't tell this jury that you didn't give a duplicate for that if you had it? A. I didn't have it, and if I had it I gave a duplicate for it.

"Q. Where is the duplicate for it? A. I didn't have it.

"Q. Therefore, you have no duplicate for it? A. I will say if I had it I had a duplicate for it.

"Q. But you haven't presented any duplicate for it, if you had it? A. There is the duplicate of all I had; you want to try to incriminate me."

It can hardly be said that the jury was not justified in concluding that defendant's possession of the narcotics was not according to the statute.

Complaint is made of the instructions; that the burden of proving his innocence was placed upon the defendant. In *State v. Bell*, 109 Kan. 767, 201 Pac. 1110, it was said in the opinion:

"It is of course correct that the court cannot shift the burden of proof to the defendant in a criminal case, but when the state has established a complete *prima facie* case against him, the defendant is under the necessity of combating that *prima facie* case or of incurring the risk of conviction. He can take his choice. If this be properly characterized as a shifting of the burden of proof, it arises from the stern necessities of defendant's predicament and not because of any arbitrary rule of law imposed on him." (p. 771.)

In *State v. Cassady*, 12 Kan. 550, it was said:

"The possession of stolen property, recently after it is stolen, is *prima facie* evidence of guilt, and throws upon the possessor the burden of explaining such possession, and if unexplained may be sufficient of itself to warrant a conviction." (Syl. ¶ 5.)

(See, also, *State v. McKinney*, 76 Kan. 419, 91 Pac. 1068; *State v.*

*White,* 76 Kan. 654, 664, 92 Pac. 829; *State v. Jewell,* 88 Kan. 130, 127 Pac. 608; *State v. Rice,* 93 Kan. 589, 144 Pac. 1016; 4 Wigmore on Evidence, §§ 2485-2513.)

It appears unnecessary to set out the instructions in full. We are of the opinion that when the entire charge is considered it fairly stated the issues to the jury. Other complaints have been considered, but we find no error which would justify reversal. The judgment is affirmed.

HARVEY, J., not sitting.